## SOUTHERN PACIFIC COMPANY *v.* JENSEN.

ERROR TO THE SUPREME COURT, APPELLATE DIVISION, THIRD JUDICIAL DEPARTMENT, OF THE STATE OF NEW YORK.

No. 280. Argued February 28, 1916; restored to docket for reargument November 13, 1916; reargued January 31, February 1, 1917.—Decided May 21, 1917.

The Federal Employers' Liability Act applies only where the injury occurs in railroad operations or their adjuncts, and cannot be extended to interstate maritime transportation merely because the vessel in the case is owned and operated by an interstate carrier by railroad.

The word "boats" in the statute refers to vessels which may be prop-

erly regarded as but part of a railroad's extension or equipment as understood and applied in common practice.

Under Art. III, § 2, of the Constitution, extending the judicial power of the United States "to all cases of admiralty and maritime jurisdiction," and Art. I, § 8, conferring on Congress power to make all laws which may be necessary and proper for executing the powers vested in the general government or in any of its departments or officers, Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country.

In the absence of controlling statutes, the general maritime law as accepted by the federal courts constitutes part of our national law applicable to matters within the admiralty and maritime jurisdiction.

The power of the States to change, modify or affect the general maritime law, while existing to some extent under the Constitution and the Judiciary Act of 1789, § 9, Judicial Code, §§ 24, 256, may not contravene the essential purposes of an act of Congress, work material prejudice to the characteristic features of the general maritime law or interfere with the proper harmony and uniformity of that law in its international and interstate relations.

Work performed by a stevedore on board a ship in unloading her at wharf in navigable waters is maritime; his employment for such work and injuries suffered in it are likewise maritime, and the rights and liabilities arising from such work, employment and injuries are clearly within the admiralty jurisdiction. *Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52.

A stevedore engaged on an interstate ship in unloading her at wharf in navigable waters in New York was accidentally injured and killed, and an award of compensation was made against the shipowner by the New York Workmen's Compensation Commission under the New York Workmen's Compensation Act (*New York Central R. R. Co.* v. *White*, 243 U. S. 188), and affirmed by the courts of that State. *Held*, that the act as applied to such a case was in conflict with the Constitution and to that extent invalid.

The remedy of the New York Workmen's Compensation Act (it provides compensation upon a prescribed scale for injuries and deaths of employees, without regard to fault, to be administered and awarded primarily through a state administrative commission), is a remedy unknown to the common law and incapable of enforcement by the ordinary processes of any court, and hence is not among the common-law remedies which are saved to suitors from the exclusive admiralty jurisdiction by Judiciary Act of 1789, § 9; Judicial Code, §§ 24, 256.

The remedy of the New York Workmen's Compensation Act is inconsistent with the policy of Congress to encourage investments in ships, manifested by the Acts of 1851 and 1884 (Rev. Stats., §§ 4283–4285; c. 121, 23 Stat. 57), which declare a limitation upon the liability of their owners.

215 N. Y. 514, reversed.

THE case is stated in the opinion.

*Mr. Norman B. Beecher,* with whom *Mr. Ray Rood Allen* was on the briefs, for plaintiff in error.

*Mr. E. Clarence Aiken,* with whom *Mr. Egburt E. Woodbury,* Attorney General of the State of New York, and *Mr. Harold J. Hinman* were on the briefs, for defendant in error.

*Mr. Christopher M. Bradley,* by leave of court, filed a brief on behalf of the Industrial Accident Commission of the State of California, as *amicus curiæ.*

MR. JUSTICE McREYNOLDS delivered the opinion of the court.

Upon a claim regularly presented, the Workmen's Compensation Commission of New York made the following findings of fact, rulings and award, October 9, 1914:

"1. Christen Jensen, the deceased workman, was, on August 15, 1914, an employee of the Southern Pacific Company, a corporation of the State of Kentucky, where it has its principal office. It also has an office at Pier 49, North River, New York City. The Southern Pacific Company at said time was, and still is, a common carrier by railroad. It also owned and operated a steamship El Oriente, plying between the ports of New York and Galveston, Texas.

"2. On August 15, 1914, said steamship was berthed

for discharging and loading at Pier 49, North River, lying in navigable waters of the United States.

"3. On said date Christen Jensen was operating a small electric freight truck. His work consisted in driving the truck into the steamship El Oriente where it was loaded with cargo, then driving the truck out of the vessel upon a gangway connecting the vessel with Pier 49, North River, and thence upon the pier, where the lumber was unloaded from the truck. The ship was about 10 feet distant from the pier. At about 10:15 A. M., after Jensen had been doing such work for about three hours that morning, he started out of the ship with his truck loaded with lumber, a part of the cargo of the steamship El Oriente, which was being transported from Galveston, Texas, to New York City. Jensen stood on the rear of the truck, the lumber coming about to his shoulder. In driving out of the port in the side of the vessel and upon the gangway, the truck became jammed against the guide pieces on the gangway. Jensen then reversed the direction of the truck and proceeded at third or full speed backward into the hatchway. He failed to lower his head and his head struck the ship at the top line, throwing his head forward and causing his chin to hit the lumber in front of him. His neck was broken and in this manner he met his death.

"4. The business of the Southern Pacific Company in this State consisted at the time of the accident and now consists solely in carrying passengers and merchandise between New York and other States. Jensen's work consisted solely in moving cargo destined to and from other States.

"5. Jensen left him surviving Marie Jensen, his widow, 29 years of age, and Howard Jensen, his son, seven years of age, and Evelyn Jensen, his daughter, three years of age.

"6. Jensen's average weekly wage was $19.60 per week.

"7. The injury was an accidental injury and arose out of

and in the course of Jensen's employment by the Southern Pacific Company and his death was due to such injury. The injury did not result solely from the intoxication of the injured employee while on duty, and was not occasioned by the wilful intention of the injured employee to bring about the injury or death of himself or another."

"This claim comes within the meaning of Chapter 67 of the Consolidated Laws as re-enacted and amended by Chapter 41 of the Laws of 1914, and as amended by Chapter 316 of the Laws of 1914."

"Award of compensation is hereby made to Marie Jensen, widow of the deceased, at the rate of $5.87 weekly during her widowhood with two years' compensation in one sum in case of her remarriage; to Harold Jensen, son of the deceased, at the rate of $1.96 per week and to Evelyn Jensen, daughter of the deceased, at the rate of $1.96 per week until the said Harold Jensen and Evelyn Jensen respectively shall arrive at the age of eighteen years, and there is further allowed the sum of One Hundred ($100) Dollars for funeral expenses."

In due time the Southern Pacific Company objected to the award "upon the grounds that the Act does not apply because the workman was engaged in interstate commerce on board a vessel of a foreign corporation of the State of Kentucky which was engaged solely in interstate commerce; that the injury was one with respect to which Congress may establish, and has established, a rule of liability, and under the language of Section 114,[1] [copied

---

[1] *Section 114.* "The provisions of this chapter shall apply to employers and employees engaged in intrastate, and also in interstate or foreign commerce, for whom a rule of liability or method of compensation has been or may be established by the Congress of the United States, only to the extent that their mutual connection with intrastate work may and shall be clearly separable and distinguishable from interstate or foreign commerce, except that such employer and his employees working only in this state may, subject to the approval and in the

in the margin] the Act has no application; on the ground that the Act includes only those engaged in the operation of vessels other than those of other states and countries in foreign and interstate commerce, while the work upon which the deceased workman was engaged at the time of his death was part of the operation of a vessel of another state engaged in interstate commerce, and hence does not come within the provisions of the Act; further, that the Act is unconstitutional, as it constitutes a regulation of and burden upon commerce among the several States in violation of Article I, Section 8, of the Constitution of the United States; in that it takes property without due process of law in violation of the 14th Amendment of the Constitution; in that it denies the Southern Pacific Company the equal protection of the laws in violation of the 14th Amendment of the Constitution because the Act does not afford an exclusive remedy, but leaves the employer and its vessels subject to suit in admiralty; also that the Act is unconstitutional in that it violates Article III, Section 2, of the Constitution conferring admiralty jurisdiction upon the courts of the United States."

Without opinion, the Appellate Division approved the award and the Court of Appeals affirmed this action (215 N. Y. 514, 519), holding that the Workmen's Compensation Act applied to the employment in question and was not obnoxious to the Federal Constitution. It said: "The scheme of the statute is essentially and fundamentally one by the creation of a state fund to insure the payment of a prescribed compensation based on earnings for disability or death from accidental injuries sustained by employees engaged in certain enumerated hazardous employments. The state fund is created from premiums

manner provided by the commission and so far as not forbidden by any act of Congress, accept and become bound by the provisions of this chapter in like manner and with the same effect in all respects as provided herein for other employers and their employees."

paid by employers based on the payroll, the number of employees and the hazards of the employment. The employer has the option of insuring with any stock corporation or mutual association authorized to transact such business, or of furnishing satisfactory proof to the commission of his own financial ability to pay. If he does neither he is liable to a penalty equal to the *pro rata* premium payable to the state fund during the period of his non-compliance and is subject to a suit for damages by the injured employee, or his legal representative in case of death, in which he is deprived of the defenses of contributory negligence, assumed risk and negligence of a fellow-servant. By insuring in the state fund, or by himself or his insurance carrier paying the prescribed compensation, the employer is relieved from further liability for personal injuries or death sustained by employees. Compensation is to be made without regard to fault as a cause of the injury, except where it is occasioned by the willful intention of the injured employee to bring about the injury or death of himself or another or results solely from his intoxication while on duty. Compensation is not based on the rule of damages applied in negligence suits but in addition to providing for medical, surgical or other attendance or treatment and funeral expenses it is based solely on loss of earning power. Thus the risk of accidental injuries occurring with or without fault on the part either of employee or employer is shared by both and the burden of making compensation is distributed over all the enumerated hazardous employments in proportion to the risk involved." See also *Walker* v. *Clyde Steamship Co.*, 215 N. Y. 529.

In *New York Central R. R. Co.* v. *White,* 243 U. S. 188, we held the statute valid in certain respects; and, considering what was there said, only two of the grounds relied on for reversal now demand special consideration. First. Plaintiff in error being an interstate common

carrier by railroad is responsible for injuries received by employees while engaged therein under the Federal Employers' Liability Act of April 22, 1908, c. 149, 35 Stat. 65, and no state statute can impose any other or different liability. Second. As here applied, the Workmen's Compensation Act conflicts with the general maritime law, which constitutes an integral part of the federal law under Art. III, § 2, of the Constitution, and to that extent is invalid.

The Southern Pacific Company, a Kentucky Corporation, owns and operates a railroad as a common carrier; also the steamship El Oriente plying between New York and Galveston, Texas. The claim is that therefore rights and liabilities of the parties here must be determined in accordance with the Federal Employers' Liability Act. But we think that act is not applicable in the circumstances.

The first Federal Employers' Liability Act (June 11, 1906, c. 3073, 34 Stat. 232) extended in terms to all common carriers engaged in interstate or foreign commerce, and because it embraced subjects not within the constitutional authority of Congress was declared invalid. *The Employers' Liability Cases,* 207 U. S. 463, January 6, 1908. The later act is carefully limited and provides that "every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States and Territories, or between the District of Columbia or any of the States and Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's

parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

Evidently the purpose was to prescribe a rule applicable where the parties are engaging in something having direct and substantial connection with railroad operations, and not with another kind of carriage recognized as separate and distinct from transportation on land and no mere adjunct thereto. It is unreasonable to suppose that Congress intended to change long-established rules applicable to maritime matters merely because the ocean-going ship concerned happened to be owned and operated by a company also a common carrier by railroad. The word "boats" in the statute refers to vessels which may be properly regarded as in substance but part of a railroad's extension or equipment as understood and applied in common practice.

The fundamental purpose of the Compensation Law as declared by the Court of Appeals is "the creation of a state fund to insure the payment of a prescribed compensation based on earnings for disability or death from accidental injuries sustained by employees engaged in certain enumerated hazardous employments," among them being "longshore work, including the loading or unloading of cargoes or parts of cargoes of grain, coal, ore, freight, general merchandise, lumber or other products or materials, or moving or handling the same on any dock, platform or place, or in any warehouse or other place of storage." Its general provisions are specified in our opinion in *New York Central R. R. Co.* v. *White, supra,* and need not be repeated. Under the construction adopted by the state courts no ship may load or discharge her

cargo at a dock therein without incurring a penalty, unless her owners comply with the act which, in order to secure payment of compensation for accidents, generally without regard to fault and based upon annual wages, provides (§ 50) that—"An employer shall secure compensation to his employees in one of the following ways:

"1. By insuring and keeping insured the payment of such compensation in the state fund, or—2. By insuring and keeping insured the payment of such compensation with any stock corporation or mutual association authorized to transact the business of workmen's compensation insurance in this state. If insurance be so effected in such a corporation or mutual association the employer shall forthwith file with the commission, in form prescribed by it, a notice specifying the name of such insurance corporation or mutual association together with a copy of the contract or policy of insurance.—3. By furnishing satisfactory proof to the commission of his financial ability to pay such compensation for himself, in which case the commission may, in its discretion, require the deposit with the commission of securities of the kind prescribed in section thirteen of the insurance law, in an amount to be determined by the commission, to secure his liability to pay the compensation provided in this chapter."

"If an employer fail to comply with this section, he shall be liable to a penalty during which such failure continues of an amount equal to the pro rata premium which would have been payable for insurance in the state fund for such period of noncompliance to be recovered in an action brought by the commission."

Article III, § 2, of the Constitution, extends the judicial power of the United States "To all cases of admiralty and maritime jurisdiction;" and Article I, § 8, confers upon the Congress power "To make all laws which may be necessary and proper for carrying into execution the foregoing powers and all other powers vested by this Con-

stitution in the government of the United States or in any department or officer thereof." Considering our former opinions, it must now be accepted as settled doctrine that in consequence of these provisions Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country. *Butler* v. *Boston & Savannah Steamship Co.,* 130 U. S. 527; *In re Garnett,* 141 U. S. 1, 14. And further, that in the absence of some controlling statute the general maritime law as accepted by the federal courts constitutes part of our national law applicable to matters within the admiralty and maritime jurisdiction. *The Lottawanna,* 21 Wall. 558; *Butler* v. *Boston & Savannah Steamship Co.,* 130 U. S. 527, 557; *Workman* v. *New York City,* 179 U. S. 552.

In *The Lottawanna,* Mr. Justice Bradley speaking for the court said: "That we have a maritime law of our own, operative throughout the United States, cannot be doubted. The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend 'to all cases of admiralty and maritime jurisdiction.' . . . One thing, however, is unquestionable; the Constitution must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been intended to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states."

By § 9, Judiciary Act of 1789, 1 Stat. 76, 77, the District Courts of the United States were given "exclusive original cognizance of all civil causes of admiralty and

maritime jurisdiction; . . . saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." And this grant has been continued. Judicial Code, §§ 24 and 256.

In view of these constitutional provisions and the federal act it would be difficult, if not impossible, to define with exactness just how far the general maritime law may be changed, modified, or affected by state legislation. That this may be done to some extent cannot be denied. A lien upon a vessel for repairs in her own port may be given by state statute, *The Lottawanna*, 21 Wall. 558, 579, 580; *The J. E. Rumbell*, 148 U. S. 1; pilotage fees fixed, *Cooley* v. *Board of Wardens*, 12 How. 299; *Ex parte McNiel*, 13 Wall. 236, 242; and the right given to recover in death cases, *The Hamilton*, 207 U. S. 398; *La Bourgogne*, 210 U. S. 95, 138. See *The City of Norwalk*, 55 Fed. Rep. 98, 106. Equally well established is the rule that state statutes may not contravene an applicable act of Congress or affect the general maritime law beyond certain limits. They cannot authorize proceedings *in rem* according to the course in admiralty, *The Moses Taylor*, 4 Wall. 411; *Steamboat Co.* v. *Chase*, 16 Wall. 522, 534; *The Glide*, 167 U. S. 606; nor create liens for materials used in repairing a foreign ship, *The Roanoke*, 189 U. S. 185. See *Workman* v. *New York City*, 179 U. S. 552. And plainly, we think, no such legislation is valid if it contravenes the essential purpose expressed by an act of Congress or works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and interstate relations. This limitation, at the least, is essential to the effective operation of the fundamental purposes for which such law was incorporated into our national laws by the Constitution itself. These purposes are forcefully indicated in the foregoing quotations from *The Lottawanna*.

A similar rule in respect to interstate commerce deduced

from the grant to Congress of power to regulate it is now firmly established. "Where the subject is national in its character, and admits and requires uniformity of regulation, affecting alike all the States, such as transportation between the States, including the importation of goods from one State into another, Congress can alone act upon it and provide the needed regulations. The absence of any law of Congress on the subject is equivalent to its declaration that commerce in that matter shall be free." *Bowman* v. *Chicago & Northwestern Ry. Co.,* 125 U. S. 465, 507, 508; *Vance* v. *Vandercook Co.,* 170 U. S. 438, 444; *Clark Distilling Co.* v. *Western Maryland Ry. Co.,* 242 U. S. 311. And the same character of reasoning which supports this rule, we think, makes imperative the stated limitation upon the power of the States to interpose where maritime matters are involved.

The work of a stevedore in which the deceased was engaging is maritime in its nature; his employment was a maritime contract; the injuries which he received were likewise maritime; and the rights and liabilities of the parties in connection therewith were matters clearly within the admiralty jurisdiction. *Atlantic Transport Co.* v. *Imbrovek,* 234 U. S. 52, 59, 60.

If New York can subject foreign ships coming into her ports to such obligations as those imposed by her Compensation Statute, other States may do likewise. The necessary consequence would be destruction of the very uniformity in respect to maritime matters which the Constitution was designed to establish; and freedom of navigation between the States and with foreign countries would be seriously hampered and impeded. A far more serious injury would result to commerce than could have been inflicted by the Washington statute authorizing a materialman's lien condemned in *The Roanoke.* The legislature exceeded its authority in attempting to extend the statute under consideration to conditions like those here disclosed.

So applied, it conflicts with the Constitution and to that extent is invalid.

Exclusive jurisdiction of all civil cases of admiralty and maritime jurisdiction is vested in the Federal District Courts, "saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it." The remedy which the Compensation Statute attempts to give is of a character wholly unknown to the common law, incapable of enforcement by the ordinary processes of any court and is not saved to suitors from the grant of exclusive jurisdiction. *The Hine* v. *Trevor*, 4 Wall. 555, 571, 572; *The Belfast*, 7 Wall. 624, 644; *Steamboat Co.* v. *Chase*, 16 Wall. 522, 531, 533; *The Glide*, 167 U. S. 606, 623. And finally this remedy is not consistent with the policy of Congress to encourage investments in ships manifested in the Acts of 1851 and 1884 (Rev. Stats., §§ 4283–4285; § 18, Act of June 26, 1884, c. 121, 23 Stat. 57) which declare a limitation upon the liability of their owners. *Richardson* v. *Harmon*, 222 U. S. 96, 104.

The judgment of the court below must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*


Mr. Justice Holmes, dissenting.


The Southern Pacific Company has been held liable under the statutes of New York for an accidental injury happening upon a gang-plank between a pier and the company's vessel and causing the death of one of its employees. The company not having insured as permitted, the statute may be taken as if it simply imposed a limited but absolute liability in such a case. The short question is whether the power of the State to regulate the liability in that place and to enforce it in the State's own courts is taken away by the conferring of exclusive jurisdiction

of all civil causes of admiralty and maritime jurisdiction upon the courts of the United States.

There is no doubt that the saving to suitors of the right of a common-law remedy leaves open the common-law jurisdiction of the state courts, and leaves some power of legislation at least, to the States. For the latter I need do no more than refer to state pilotage statutes, and to liens created by state laws in aid of maritime contracts. Nearer to the point, it is decided that a statutory remedy for causing death may be enforced by the state courts, although the death was due to a collision upon the high seas. *Steamboat Co.* v. *Chase,* 16 Wall. 522. *Sherlock* v. *Alling,* 93 U. S. 99, 104. *Knapp, Stout & Co.* v. *McCaffrey,* 177 U. S. 638, 646. *Minnesota Rate Cases,* 230 U. S. 352, 409. The misgivings of Mr. Justice Bradley were adverted to in *The Hamilton,* 207 U. S. 398, and held at least insufficient to prevent the admiralty from recognizing such a state-created right in a proper case, if indeed they went to any such extent. *La Bourgogne,* 210 U. S. 95, 138.

The statute having been upheld in other respects, *New York Central R. R. Co.* v. *White,* 243 U. S. 188, I should have thought these authorities conclusive. The liability created by the New York act ends in a money judgment, and the mode in which the amount is ascertained, or is to be paid, being one that the State constitutionally might adopt, cannot matter to the question before us if any liability can be imposed that was not known to the maritime law. And as such a liability can be imposed where it was unknown not only to the maritime but to the common law, I can see no difference between one otherwise constitutionally created for death caused by accident and one for death due to fault. Neither can the statutes limiting the liability of owners affect the case. Those statutes extend to non-maritime torts, which of course are the creation of state law. *Richardson* v. *Harmon,* 222 U. S.

96, 104. They are paramount to but not inconsistent with the new cause of action. However, as my opinion stands on grounds that equally would support a judgment for a maritime tort not ending in death, with which admiralty courts have begun to deal, I will state the reasons that satisfy my mind.

No doubt there sometimes has been an air of benevolent gratuity in the admiralty's attitude about enforcing state laws. But of course there is no gratuity about it. Courts cannot give or withhold at pleasure. If the claim is enforced or recognized it is because the claim is a right, and if a claim depending upon a state statute is enforced it is because the State had constitutional power to pass the law. Taking it as established that a State has constitutional power to pass laws giving rights and imposing liabilities for acts done upon the high seas when there were no such rights or liabilities before, what is there to hinder its doing so in the case of a maritime tort? Not the existence of an inconsistent law emanating from a superior source, that is, from the United States. There is no such law. The maritime law is not a *corpus juris*—it is a very limited body of customs and ordinances of the sea. The nearest to anything of the sort in question was the rule that a seaman was entitled to recover the expenses necessary for his cure when the master's negligence caused his hurt. The maritime law gave him no more. *The Osceola,* 189 U. S. 158, 175. One may affirm with the sanction of that case that it is an innovation to allow suits in the admiralty by seamen to recover damages for personal injuries caused by the negligence of the master and to apply the common-law principles of tort.

Now, however, common-law principles have been applied to sustain a libel by a stevedore *in personam* against the master for personal injuries suffered while loading a ship, *Atlantic Transport Co.* v. *Imbrovek,* 234 U. S. 52; and *The Osceola* recognizes that in some cases at

least seamen may have similar relief. From what source do these new rights come? The earliest case relies upon "the analogies of the municipal law," *The Edith Godden,* 23 Fed. Rep. 43, 46,—sufficient evidence of the obvious pattern, but inadequate for the specific origin. I recognize without hesitation that judges do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions. A common-law judge could not say I think the doctrine of consideration a bit of historical nonsense and shall not enforce it in my court. No more could a judge exercising the limited jurisdiction of admiralty say I think well of the common-law rules of master and servant and propose to introduce them here *en bloc.* Certainly he could not in that way enlarge the exclusive jurisdiction of the District Courts and cut down the power of the States. If admiralty adopts common-law rules without an act of Congress it cannot extend the maritime law as understood by the Constitution. It must take the rights of the parties from a different authority, just as it does when it enforces a lien created by a State. The only authority available is the common law or statutes of a State. For from the often repeated statement that there is no common law of the United States, *Wheaton* v. *Peters,* 8 Pet. 591, 658; *Western Union Telegraph Co.* v. *Call Publishing Co.,* 181 U. S. 92, 101, and from the principles recognized in *Atlantic Transport Co.* v. *Imbrovek* having been unknown to the maritime law, the natural inference is that in the silence of Congress this court has believed the very limited law of the sea to be supplemented here as in England by the common law, and that here that means, by the common law of the State. *Sherlock* v. *Alling,* 93 U. S. 99, 104. *Taylor* v. *Carryl,* 20 How. 583, 598. So far as I know, the state courts have made this assumption without criticism or attempt at revision from the beginning to this day; e. g. *Wilson* v. *MacKenzie,* 7 Hill (N. Y.), 95. *Gabrielson* v. *Waydell,* 135 N. Y. 1, 11.

*Kalleck* v. *Deering*, 161 Massachusetts, 469. See *Ogle* v. *Barnes*, 8 T. R. 188. *Nicholson* v. *Mounsey*, 15 East, 384. Even where the admiralty has unquestioned jurisdiction the common law may have concurrent authority and the state courts concurrent power. *Schoonmaker* v. *Gilmore*, 102 U. S. 118. The invalidity of state attempts to create a remedy for maritime contracts or torts, parallel to that in the admiralty, that was established in such cases as *The Moses Taylor*, 4 Wall. 411, and *The Hine* v. *Trevor*, 4 Wall. 555, is immaterial to the present point.

The common law is not a brooding omnipresence in the sky but the articulate voice of some sovereign or quasi-sovereign that can be identified; although some decisions with which I have disagreed seem to me to have forgotten the fact. It always is the law of some State, and if the District Courts adopt the common law of torts, as they have shown a tendency to do, they thereby assume that a law not of maritime origin and deriving its authority in that territory only from some particular State of this Union also governs maritime torts in that territory—and if the common law, the statute law has at least equal force, as the discussion in *The Osceola* assumes. On the other hand the refusal of the District Courts to give remedies coextensive with the common law would prove no more than that they regarded their jurisdiction as limited by the ancient lines—not that they doubted that the common law might and would be enforced in the courts of the States as it always has been. This court has recognized that in some cases different principles of liability would be applied as the suit should happen to be brought in a common-law or admiralty court. Compare *The Max Morris*, 137 U. S. 1, with *Belden* v. *Chase*, 150 U. S. 674, 691. But hitherto it has not been doubted authoritatively, so far as I know, that even when the admiralty had a rule of its own to which it adhered, as in *Workman* v. *New York City*, 179 U. S. 552, the state law, common or statute,

would prevail in the courts of the State.   Happily such conflicts are few.

It might be asked why, if the grant of jurisdiction to the courts of the United States imports a power in Congress to legislate, the saving of a common-law remedy, i. e., in the state courts, did not import a like if subordinate power in the States.   But leaving that question on one side, such cases as *Steamboat Co.* v. *Chase*, 16 Wall. 522, *The Hamilton*, 207 U. S. 398, and *Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52, show that it is too late to say that the mere silence of Congress excludes the statute or common law of a State from supplementing the wholly inadequate maritime law of the time of the Constitution, in the regulation of personal rights, and I venture to say that it never has been supposed to do so, or had any such effect.

As to the spectre of a lack of uniformity I content myself with referring to *The Hamilton*, 207 U. S. 398, 406. The difficulty really is not so great as in the case of interstate carriers by land, which "in the absence of Federal statute providing a different rule are answerable according to the law of the State for nonfeasance or misfeasance within its limits."   *The Minnesota Rate Cases*, 230 U. S. 352, 408, and cases cited.   The conclusion that I reach accords with the considered cases of *Lindstrom* v. *Mutual Steamship Co.*, 132 Minnesota, 328; *Kennerson* v. *Thames Towboat Co.*, 89 Connecticut, 367; and *North Pacific S. S. Co.* v. *Industrial Accident Commission of California*, 163 Pac. Rep. 199, as well as with the New York decision in this case.   215 N. Y. 514.

MR. JUSTICE PITNEY, dissenting.

While concurring substantially in the dissenting opinion of Mr. Justice Holmes, I deem it proper, in view of the momentous consequences of the decision, to present some additional considerations.

This dissent is confined to that part of the prevailing opinion which holds that the Workmen's Compensation Act of New York, as applied by the state court to a fatal injury sustained by a stevedore while engaged in work of a maritime nature upon navigable water within that State, conflicts with the Constitution of the United States and the act of Congress conferring admiralty and maritime jurisdiction in civil cases upon the district courts of the United States, and is to that extent invalid. Except for the statute, an action might have been brought in a court of admiralty. *Atlantic Transport Co.* v. *Imbrovek*, 234 U. S. 52, 62. No question is raised respecting the jurisdiction of the state court over the subject matter. But plaintiff in error contends, and the prevailing opinion holds, that it was a violation of a federal right for the state court to apply the provisions of the local statute to a cause of action of maritime origin, because, by the Constitution of the United States, admiralty jurisdiction was conferred upon the federal courts.

It should be stated, at the outset, that the case involves no question of penalties imposed by the New York act, but affects solely the responsibility of the employer to make compensation to the widow, in accordance with its provisions, which are outlined in *New York Central R. R. Co.* v. *White*, 243 U. S. 188, 192–195.

The argument is that even in the absence of any act of Congress prescribing the responsibility of a shipowner to his stevedore, the general maritime law, as accepted by the federal courts when acting in the exercise of their admiralty jurisdiction, must be adopted as the rule of decision by state courts of common law when passing upon any case that might have been brought in the admiralty; and that just as the absence of an act of Congress regulating interstate commerce in some cases is equivalent to a declaration by Congress that commerce in that respect shall be free, so non-action by Congress amounts to an im-

perative limitation upon the power of the States to inter-pose where maritime matters are involved.

This view is so entirely unsupported by precedent, and will have such novel and far-reaching consequences, that it ought not to be accepted without the most thorough consideration.

Section 2 of Article III of the Constitution reads as follows: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affect-ing Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;—between a State and Citizens of another State;—between Citizens of different States;—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." Acting under the authority of Article I, § 8, which empowers Congress to make all laws necessary and proper for carrying into execution the powers vested in the Government or in any department or officer thereof, the First Congress, in the original Judi-ciary Act (Act of September 24, 1789, c. 20, § 9, 1 Stat. 73, 77), conferred upon the federal district courts "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, . . . saving to suitors, in all cases, the right of a common law remedy, where the com-mon law is competent to give it." The saving clause has been preserved in all subsequent revisions. Rev. Stats., § 563 (8); Jud. Code, § 24, (3), 36 Stat. 1087, 1091, c. 231.

From the language quoted from the Constitution, read in the light of the general purpose of that instrument and the contemporaneous construction found in the Judiciary Act, with regard also to the mischiefs that called for the

establishment of a national judiciary, and from what I believe to be the unbroken current of decisions in this court from that day until the present, I draw the following conclusions: (1) That the framers of the Constitution intended *to establish jurisdiction*—the power to hear and determine controversies of the various classes specified— and *not to prescribe particular codes or systems of law* for the decision of those controversies; (2) That the civil jurisdiction in admiralty was not intended to be exclusive of the courts of common law, at least not until Congress should deem it proper so to enact; (3) That by the law of England, and by the practice of the colonial governments, the courts of common law, of equity, and of admiralty, were controlled in their decisions by separate and in a sense independent systems of substantive law, and the constitutional grant of judicial power in "all cases in law and equity," and in "all cases of admiralty and maritime jurisdiction," was no more intended (in the absence of legislation by Congress) to make the rules of maritime law binding upon the federal courts of common law when exercising their concurrent jurisdiction, than to make the rules of the common law binding upon the courts of admiralty; (4) That if not binding upon the federal courts, it results, *a fortiori*, that the rules of maritime law were not intended to be made binding upon the courts of the States; (5) That it is not necessary, in order to give full effect to the grant of admiralty and maritime jurisdiction, to imply that the rules of decision prevailing in admiralty must be binding upon common-law courts exercising concurrent jurisdiction in civil causes of maritime origin, and to give such a construction to the Constitution is to render unconstitutional the saving clause in § 9 of the Judiciary Act, and also to trench upon the proper powers of the States by interfering with their control over their water-borne internal commerce; and (6) That, in the absence of legislation by Congress abrogating the saving

clause, the States are at liberty to administer their own laws in their own courts when exercising a jurisdiction concurrent with that of admiralty, and at liberty to change those laws by statute.

That the language of § 2 of Art. III of the Constitution speaks only of establishing jurisdiction, and does not prescribe the mode in which or the substantive law by which the exercise of that jurisdiction is to be governed, seems to me entirely plain; and upon this point I need only refer to the language itself, which I have quoted.

That this view is in harmony with the general purpose of the Constitution seems to me equally plain. At this late date it ought not to be necessary to repeat that the object of the framers of that instrument was to lay the foundations of a government, to set up its frame-work, and to establish merely the general principles by which it was to be animated; avoiding, as far as possible, any but the most fundamental regulations for controlling its operations, and these usually in the form of restrictions. *Vanhorne* v. *Dorrance,* 2 Dall. 304, 308; *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 326.

The object was to enumerate, rather than to define, the powers granted. *Gibbons* v. *Ogden,* 9 Wheat. 1, 189, 194; *Passenger Cases,* 7 How. 283, 549; *Lottery Case,* 188 U. S. 321, 346. To delineate only the great outlines of the judicial power, leaving the details to Congress, while providing for the organization of the legislative department and the mode in which and the restrictions under which its authority should be exercised. *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 721. The reason for adopting general outlines only was well expressed by Mr. Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, 407: "A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could

scarcely be embraced by the human mind. It would probably never be understood by the public. Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves. That this idea was entertained by the framers of the American constitution, is not only to be inferred from the nature of the instrument, but from the language."

The adoption of any particular system of substantive law was not within the purpose of the Constitutional Convention; and the clause establishing the judicial power was ill-adapted to the purpose had it existed. So far as they intended to prescribe permanent rules of substantive or even procedural law in connection with the establishment of the judicial system, the framers employed express terms for the purpose, as appears from other provisions of Article III, including the definition of treason, the character of proof required, the limitation of the punishment, and the requirement of a jury trial for this and other crimes.

In a somewhat exhaustive examination of various sources of information, including Elliot's Debates, Farrand's Records of the Federal Convention, and The Federalist, Nos. 80–83, I have been unable to find anything even remotely suggesting that the judicial clause was designed to establish the maritime code or any other system of laws for the determination of controversies in the courts by it established, much less any suggestion that the maritime code was to constitute the rule of decision in common-law courts, either federal or state.

Certainly, there is nothing in the mere provision establishing jurisdiction in admiralty and maritime causes to have that effect, unless the jurisdiction so established was in its nature exclusive. But, in civil causes, the jurisdic-

tion was not exclusive by the law of England and of the Colonies, and it was not made an exclusive jurisdiction by the Constitution.

In discussing this point, the distinction between the instance court and the prize court of admiralty must be observed. It was held in England that the question of prize or no prize, and other questions arising out of it, were exclusively cognizable in the admiralty, because that court took jurisdiction owing to the fact of possession of a prize of war, and the controversy turned upon belligerent rights and was determinable by the law of nations, and not the particular municipal law of any country. *Le Caux* v. *Eden* (1781), Doug. 594; 99 E. R. 375, 379–385; *Lindo* v. *Rodney*, reported in a note to *Le Caux* v. *Eden*, Doug. 613; 99 E. R. 385; *Smart* v. *Wolff* (1789), 3 T. R. 323, 340, *et seq.; Lord Camden* v. *Home* (1791), 4 T. R. 382, 393 *et seq.* But of civil actions *in personam* the instance court exercised a jurisdiction concurrent with that of the courts of common law. As Lord Mansfield said in *Lindo* v. *Rodney,* Doug. 614: "A thing being done upon the high sea don't exclude the jurisdiction of the courts of common law. For seizing, stopping, or taking a ship, upon the high sea, *not as prize,* an action will lie; but for taking *as prize,* no action will lie. The nature of the question excludes; not the locality." And again, referring to the effect of certain statutes (p. 614a): "The taking a ship upon the high sea is triable at law to repair the plaintiff in damages; but a taking on the high sea as *prize* is not triable at law to repair the plaintiff in damages. The nature of the ground of the action—*prize or no prize*—not only authorizes the prize court, but excludes the common law. These statutes don't exclude the common law in any case, and they confine the Admiralty by the locality of the thing done, which is the cause of action. It must be done upon the high sea."

So, with respect to actions *ex contractu,* Mr. Justice

Blackstone says, 3 Black. Com. 107: "It is no uncommon thing for a plaintiff to feign that a contract, really made at sea, was made at the royal exchange, or other inland place, in order to draw the cognizance of the suit from the courts of admiralty to those of Westminster Hall." The concurrent jurisdiction of the courts of common law was affirmed by Dr. Browne, the first edition of whose work was published in 1797–1799. 2 Browne's Civ. & Adm. Law (1st Am. ed.), 112, 115.

The declaration of Mr. Justice Nelson, speaking for this court in *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344, 390, that the lodging by the Constitution of the entire admiralty power in the federal judiciary, and the ninth section of the Judiciary Act, with its saving of common-law remedies, left the concurrent power of the courts of common law and of admiralty where it stood at common law, was not a chance remark. It has been so ruled in many other cases, to which I shall refer hereafter. The principles and history of the common law were well known to the framers of the Constitution and the members of the First Congress; it was from that system that their terminology was derived; and the provisions of the Constitution and contemporaneous legislation must be interpreted accordingly.

The statement that there is no common law of the United States (*Wheaton* v. *Peters*, 8 Pet. 591, 658; *Smith* v. *Alabama*, 124 U. S. 465, 478) is true only in the sense that the Constitution neither of its own force imposed, nor authorized Congress to impose, the common law or any other general body of laws upon the several States for the regulation of their internal affairs. As was pointed out in *Smith* v. *Alabama* (p. 478), "There is, however, one clear exception to the statement that there is no national common law: The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the Eng-

lish common law, and are to be read in the light of its history."

As was well expressed by Shiras, District Judge, in *Murray* v. *Chicago & N. W. Ry. Co.*, 62 Fed. Rep. 24, 31: "From them [citations of the decisions of this court] it appears, beyond question, that the Constitution, the Judiciary Act of 1789, and all subsequent statutes upon the same subject are based upon the general principles of the common law, and that, to a large extent, the legislative and judicial action of the government would be without support and without meaning if they cannot be interpreted in the light of the common law.   When the Constitution was adopted, it was not the design of the framers thereof to create any new systems of general law, nor to supplant those already in existence.   At that time there were in existence and in force in the Colonies or States, and among the people thereof, the law of nations, the law admiralty and maritime, the common law, including commercial law, and the system of equity.   Upon these foundations the Constitution was erected.   The problem sought to be solved was not whether the Constitution should create or enact a law of nations, of admiralty, of equity, or the like, but rather how should the executive, legislative, and judicial powers and duties based upon these systems, and necessary for the proper development and enforcement thereof, be apportioned between the national and state governments."

And it is not to be supposed that the framers of the Constitution, familiar with the institutions and the principles of the common law, by which the admiralty jurisdiction was allowed on sufferance, 'and with a degree of jealousy born of the fact that the courts of admiralty were not courts of record, that they followed the practice of the civil law, allowed no trial by jury, and administered an exotic system of laws (3 Black. Com. 69, 86, 87, 106–108) —it is not to be supposed, I say, that the framers of the

Constitution, in granting judicial power over cases of admiralty and maritime jurisdiction, along with like power over all cases in law and equity arising under the laws of the United States, intended to exclude common-law courts, state or national, from any part of their concurrent jurisdiction in cases of maritime origin, or to deprive them of the judicial power, theretofore existing, to decide such cases according to the rules of the common law.

It is matter of familiar history that one of the chief weaknesses of the Confederation was in the absence of a judicial establishment possessed of general authority. Except that the Continental Congress, as an incident of the war power, was authorized to establish rules respecting captures and the disposition of prizes of war and to appoint courts for the trial of piracies and felonies committed on the high sea, and for determining appeals in cases of capture, and except that the Congress itself, through commissioners, was to exercise jurisdiction in disputes between the States and in controversies respecting conflicting land grants of different States, there was no provision in the Articles of Confederation for establishing a judicial system under the authority of the general government.

The result was that not only private parties, in cases arising out of the laws of the Congress, but the United States themselves, were obliged to resort to the courts of the States for the enforcement of their rights. Many cases of this character are reported, some even antedating the Confederation. *Respublica* v. *Sweers* (1779), 1 Dall. 41; *Respublica* v. *Powell* (1780), 1 Dall. 47; *Respublica* v. *De Longchamps* (1784), 1 Dall. 111. Even treason was punished in state courts and under state laws. See cases of *Molder, Malin, Carlisle* and *Roberts* (1778), 1 Dall. 33–39.

Before the Revolution, courts of admiralty jurisdiction were a part of the judicial systems of the several Colonies.

*Waring* v. *Clarke*, 5 How. 441, 454–456; Benedict on Admiralty, §§ 118–165. Upon the outbreak of the War questions of prize law became acute, and the colonial Congress, by resolutions of November 25, 1775, passed in the exercise of the war power (3 Dall. 54, 80) made appropriate recommendations for the treatment of prizes of war, but remitted the jurisdiction over such questions to the courts of the several Colonies, reserving to itself only appellate authority. This system continued until the year 1780 (after the submission of the Articles of Confederation, but before their final ratification), when the Congress established a court for the hearing of appeals from the state courts of admiralty in cases of capture. The opinions of this court are reported in 2 Dall. 1–42, and numerous cases decided without opinion, as well as some of those decided by committees of the Congress prior to the establishment of the court, are referred to in the late Bancroft Davis' "Federal Courts Before the Constitution," 131 U. S., Appendix, xix–xlix. The weak point of this system was the want of power in the central government to enforce the judgment of the appellate tribunal when it chanced to reverse the decree of a state court. There were some curious cases of conflicting jurisdiction, illustrated by *Doane* v. *Penhallow* (1787), 1 Dall. 218, 221; *Penhallow* v. *Doane* (1795), 3 Dall. 54, 79, 86; and *United States* v. *Peters* (1809), 5 Cranch, 115, 135, 137.

It was under the influence of numerous experiences of the inefficiency of a general government unendowed with judicial authority that the Constitutional Convention assembled in the year 1787. The fundamental need, to which the Convention addressed itself in framing the judiciary article, was to set up a judicial power covering all subjects of national concern. There was no greater need to establish jurisdiction over admiralty and maritime causes than over controversies arising under the Constitution and laws of the Union. There was no purpose to

establish a system of substantive law in any of the several classes of cases included within the grant of judicial power. The language employed makes it plain that, with the few express exceptions already noted (treason, etc.), the rules of decision were to be sought elsewhere. The entire absence of a purpose to establish a maritime code is manifest not only from the omission of any reference to the laws of Oleron, the laws of Wisbuy, or any other of the maritime codes recognized by the nations of Europe, but further from the fact that the Colonies differed among themselves as to maritime law and admiralty practice, and that their system in general differed from that which was administered in England. The evident purpose, in this as in the other classes of controversy, was that the courts of admiralty should administer justice according to the previous course and practice of such courts in the Colonies, just as the courts of common-law and equity jurisdiction were to proceed according to the several systems of substantive law appropriate to courts of their respective kinds; subject, of course, to the power of Congress to change the rules of law respecting matters lying within its appropriate sphere of action.

Undoubtedly the framers of the Constitution were advised of the ancient controversy in England between the common-law courts and the courts of admiralty respecting the extent of the jurisdiction of the latter. They were aware of the dual function of the admiralty courts as courts of instance and as prize courts, and of the established rule that in civil causes the jurisdiction of the instance court was concurrent with that of the courts of common law. They must have known that, whatever question had existed as to the territorial limits of the jurisdiction of the admiralty, it never had been questioned that in suits for mariners' wages and suits upon policies of marine insurance, and in other actions *ex contractu* having a maritime character, and also in actions of tort

arising upon the sea, the courts of common law exercised, and long had exercised, concurrent jurisdiction. Whatever early doubts may have existed had been based not upon any inherent incapacity of the common-law courts to deal with the subject matters, but upon the ancient theory of the venue, and disappeared with the recognition of the fictitious venue.

The grant of judicial power in cases of admiralty and maritime jurisdiction never has been construed as excluding the jurisdiction of the courts of common law over civil causes that before the Constitution were subject to the concurrent jurisdiction of the courts of admiralty and the common-law courts. The First Congress did not so construe it, as the saving clause in the Judiciary Act conclusively shows. And, assuming that the States, in the absence of legislation by Congress, would be without power over the subject matter, this saving clause, still maintained upon the statute book, is a sufficient grant of power. Jurisdiction in prize cases, as has been shown, springs out of the possession of a prize of war. Civil proceedings *in rem*, to be mentioned hereafter, are based upon the maritime lien, where possession in the claimant is neither necessary nor usual as is the case with common-law liens. With these exceptions, both resting upon grounds peculiar to the forum of the admiralty, concurrent jurisdiction of the courts of common law in civil cases of maritime origin always has been recognized by this court. *New Jersey Steam Navigation Co.* v. *Merchants' Bank*, 6 How. 344, 390; *Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, 458; *The Belfast*, 7 Wall. 624, 644–645; *Insurance Co.* v. *Dunham*, 11 Wall. 1, 32; *Leon* v. *Galceran*, 11 Wall. 185, 187–188; *Steamboat Co.* v. *Chase*, 16 Wall. 522, 533; *Schoonmaker* v. *Gilmore*, 102 U. S. 118; *Manchester* v. *Massachusetts*, 139 U. S. 240, 262.

Nor is the reservation of a common-law remedy limited to such causes of action as were known to the common law

at the time of the passage of the Judiciary Act. It includes
statutory changes. *Steamboat Co.* v. *Chase*, 16 Wall. 522,
533, 534; *Knapp, Stout & Co.* v. *McCaffrey*, 177 U. S. 638,
644. Those remedies which were held not to be common-
law remedies, within the saving clause, in *The Moses
Taylor,* 4 Wall. 411, 427, 431; *The Hine* v. *Trevor*, 4 Wall.
555, 571, 572; *The Belfast*, 7 Wall. 624, 644; *Steamboat
Co.* v. *Chase*, 16 Wall. 522, 533, and *The Glide*, 167 U. S.
606, 623, provided for imposing a lien on the ship by pro-
ceedings in the nature of admiralty process *in rem*, and
it was for this reason only that they were held to trench
upon the exclusive admiralty jurisdiction of the courts
of the United States. The distinction was noticed in *Leon*
v. *Galceran*, 11 Wall. 185, 189, and again in *Knapp, Stout
& Co.* v. *McCaffrey*, 177 U. S. 638, 642. In the latter case
it was pointed out (p. 644) that the reservation of a
common-law remedy where the common law is competent
to give it was not confined to common-law actions but
included remedies without action, such as a distress for
rent or for the trespass of cattle; a bailee's remedy by
detaining personal property until paid for work done upon
it or for expenses incurred in keeping it; the lien of an inn-
keeper upon the goods of his guests, and that of a carrier
upon things carried; the remedy of a nuisance by abate-
ment, and others. The most recent definition of the rule
laid down in *The Hine* v. *Trevor* and other cases of that
class is in *Rounds* v. *Cloverport Foundry & Machine Co.*,
237 U. S. 303.

I have endeavored to show, from a consideration of the
phraseology of the constitutional grant of jurisdiction and
the act of the First Congress passed to give effect to it,
from the history in the light of which the language of those
instruments is to be interpreted, and from the uniform
course of decision in this court from the earliest time until
the present, these propositions: First, that the grant of
jurisdiction to the admiralty was not intended to be ex-

clusive of the concurrent jurisdiction of the common-law courts theretofore recognized; and, secondly, that neither the Constitution nor the Judiciary Act was intended to prescribe a system of substantive law to govern the several courts in the exercise of their jurisdiction, much less to make the rules of decision, prevalent in any one court, obligatory upon others, exercising a distinct jurisdiction, or binding upon the courts of the States when acting within the bounds of their respective jurisdictions. In fact, while courts of admiralty undoubtedly were expected to administer justice according to the law of nations and the customs of the sea, they were left at liberty to lay hold of common-law principles where these were suitable to their purpose, and even of applicable state statutes, just as courts of common law were at liberty to adopt the rules of maritime law as guides in the proper performance of their duties. This eclectic method had been practiced by the courts of each jurisdiction prior to the Constitution, and there is nothing in that instrument to constrain them to abandon it.

The decisions of this court show that the courts of admiralty in many matters are bound by local law. The doubt expressed by Mr. Justice Bradley in *Butler* v. *Boston & Savannah Steamship Co.*, 130 U. S. 527, 558, as to whether a state law could have force to create a liability in a maritime case at all, was laid aside in *The Corsair*, 145 U. S. 335, and definitely set at rest in *The Hamilton*, 207 U. S. 398, 404. The fact is that, long before *Butler* v. *Boston & Savannah Steamship Co.*, it had been recognized that state laws might not merely create a liability in a maritime case, but impose a duty upon the admiralty courts of the United States to enforce such liability. Thus, while it was recognized that by the general maritime law a foreign ship, or a ship in a port of a State to which she did not belong, was subject to a suit *in rem* in the admiralty for repairs or necessaries, the case of a ship in a

port of her home State was governed by the municipal law of the State, and no lien for repairs or necessaries would be implied unless recognized by that law. *The General Smith* (1819), 4 Wheat. 438, 443; *The Lottawanna,* 21 Wall. 558, 571, 578. Conversely, it was held in the case of *The Planter* (*Peyroux* v. *Howard,* 1833), 7 Pet. 324, 341, that a libel *in rem* in the admiralty might be maintained against a vessel for repairs done in her home port where a local statute gave a lien in such a case. To the same effect, *The J. E. Rumbell,* 148 U. S. 1, 12. As elsewhere pointed out herein, where a state statute conferred a lien operative strictly *in rem,* it was uniformly held not enforceable in the state courts, but only because it trenched upon the peculiar jurisdiction of the admiralty, and therefore was not a "common-law remedy" within the saving clause of the Judiciary Act of 1789. *The Moses Taylor,* 4 Wall. 411, 427, 431; *The Hine* v. *Trevor,* 4 Wall. 555, 571, 572; *The Belfast,* 7 Wall. 624, 644; *Steamboat Co.* v. *Chase,* 16 Wall. 522, 533; *The Glide,* 167 U. S. 606, 623.

Under these decisions, and others to the same effect, the substance of the matter is that a State may, by statute, create a right to a lien upon a domestic vessel, in the nature of a maritime lien, which may be enforced in admiralty in the courts of the United States; but a State may not confer upon its own courts jurisdiction to enforce such a lien, because the federal jurisdiction in admiralty is exclusive. *The J. E. Rumbell,* 148 U. S. 1, 12, and cases cited. But a lien imposed not upon the *rem* but upon defendant's interest in the *res* may be made enforceable in the state courts. *Rounds* v. *Cloverport Foundry & Machine Co.,* 237 U. S. 303, 307, and cases cited.

*The Roanoke,* 189 U. S. 185, 194, 198, while approving *The General Smith, The Planter, The Lottawanna,* and *The J. E. Rumbell, supra,* gave a negative answer to the very different question whether a State could, without encroaching upon the federal jurisdiction, create a lien

against foreign vessels to be enforced in the courts of the
United States.

In the present case there is no question of lien, and, I
repeat, no question concerning the jurisdiction of the state
court; the crucial inquiry is, to what law was it bound to
conform in rendering its decision? Or, rather, the ques-
tion is the narrower one: Do the Constitution and laws of
the United States prevent a state court of common law
from applying the state statutes in an action *in personam*
arising upon navigable water within the State, there being
no act of Congress applicable to the controversy? I con-
fess that until this case and kindred cases submitted at the
same time were brought here, I never had supposed that it
was open to the least doubt that the reservation to suitors
of the right of a common-law remedy had the effect of re-
serving at the same time the right to have their common-
law actions determined according to the rules of the com-
mon law, or state statutes modifying those rules. This
court repeatedly has so declared, at the same time recog-
nizing fully that the point involves the question of state
power. In *United States* v, *Bevans*, 3 Wheat. 336, 388, the
court, by Mr. Chief Justice Marshall, said: "Can the
cession of all cases of admiralty and maritime jurisdiction
be construed into a cession of the waters on which those
cases may arise? This is a question on which the court is
incapable of feeling a doubt. The article which describes
the judicial power of the United States is not intended for
the cession of territory, or of general jurisdiction. It is
obviously designed for other purposes. . . . In
describing the judicial power, the framers of our Consti-
tution had not in view any cession of territory, or, which
is essentially the same, of general jurisdiction. It is not
questioned that whatever may be necessary to the full
and unlimited exercise of admiralty and maritime juris-
diction, is in the government of the Union. Congress may
pass all laws which are necessary and proper for giving

the most complete effect to this power. Still, the general jurisdiction over the place, subject to this grant of power, adheres to the territory, as a portion of the sovereignty not yet given away." In *Steamboat Co.* v. *Chase, supra,* the court, by Mr. Justice Clifford, said (p. 534): "State statutes, if applicable to the case, constitute the rules of decision in common-law actions, in the Circuit Courts as well as in the State courts."

In *Atlee* v. *Packet Co.*, 21 Wall. 389, 395, 396, the court, by Mr. Justice Miller, said: "The plaintiff has elected to bring his suit in an admiralty court, which has jurisdiction of the case, notwithstanding the concurrent right to sue at law. In this court the course of proceeding is in many respects different and the rules of decision are different. . . . An important difference as regards this case is the rule for estimating the damages. In the common-law court the defendant must pay all the damages or none. If there has been on the part of plaintiffs such carelessness or want of skill as the common law would esteem to be contributory negligence, they can recover nothing. By the rule of the admiralty court, where there has been such contributory negligence, or in other words, when both have been in fault, the entire damages resulting from the collision must be equally divided between the parties. . . . Each court has its own set of rules for determining these questions, which may be in some respects the same, but in others vary materially." And see *The Max Morris*, 137 U. S. 1, 10; *Belden* v. *Chase*, 150 U. S. 674, 691; Benedict Adm., § 201.

In the prevailing opinion, great stress is laid upon certain expressions quoted from *The Lottawanna*, 21 Wall. 558, 574, but it seems to me they have been misunderstood, because read without regard to context and subject matter. That was an admiralty appeal, and involved the question whether by the general maritime law, as accepted in the United States, there was an implied lien for necessaries

furnished to a vessel in her home port, where no such lien was recognized by the municipal law of the State.   In the course of the discussion, the court, by Mr. Justice Bradley, said: "That we have a maritime law of our own, operative throughout the United States, cannot be doubted.   The general system of maritime law which was familiar to the lawyers and statesmen of the country when the Constitution was adopted, was most certainly intended and referred to when it was declared in that instrument that the judicial power of the United States shall extend 'to all cases of admiralty and maritime jurisdiction.'   But by what criterion are we to ascertain the precise limits of the law thus adopted?   *The Constitution does not define it.* It does not declare whether it was intended to embrace the entire maritime law as expounded in the treatises, or only the limited and restricted system which was received in England, or lastly, such modification of both of these as was accepted and recognized as law in this country.   *Nor does the Constitution attempt to draw the boundary line between maritime law and local law; nor does it lay down any criterion for ascertaining that boundary.*   It assumes that the meaning of the phrase 'admiralty and maritime jurisdiction' is well understood.   It treats this matter as it does the cognate ones of common law and equity, when it speaks of 'cases in law and equity,' or of 'suits at common law,' *without defining those terms, assuming them to be known and understood.*"

In this language there is the clearest recognition that the Constitution, in establishing and distributing the judicial power, did not intend to define substantive law, or to make the rules of decision in one jurisdiction binding *proprio vigore* in tribunals exercising another jurisdiction. The courts of common law were to administer justice according to the common law, the courts of equity according to the principles of equity, and the courts of admiralty and maritime jurisdiction according to the maritime law.

The expression on page 575 respecting the uniform opera-
tion of the maritime law was predicated only of the opera-
tion of that law as administered in the courts of admiralty,
for it is not to be believed that there was any purpose to
overrule *Atlee* v. *Packet Co.*, 21 Wall. 389, 395, decided
at the same term and only about two months before *The
Lottawanna* by a unanimous court including Mr. Justice
Bradley himself, in which it was held that where there
was concurrent jurisdiction in the courts of common law
and the courts of admiralty each court was at liberty to
adopt its own rules of decision. Moreover, the principal
question at issue in *The Lottawanna* was whether the
case of *The General Smith*, 4 Wheat. 438, should be over-
ruled, in which it had been held that, in the absence of
state legislation imposing the lien, a ship was not subject
to a libel *in rem* in the admiralty for repairs furnished in
her home port. The general expressions referred to relate
to that state of the law—the absence of state legislation, as
well as of legislation by Congress—and upon this the
decision in *The General Smith* was upheld (p. 578). But
in proceeding to discuss the subordinate question whether
there was a lien under the state statute, it was held
(p. 579): "It seems to be settled in our jurisprudence that
so long as Congress does not interpose to regulate the
subject, the rights of material-men furnishing necessaries
to a vessel in her home port may be regulated in each State
by State legislation." And again (p. 581): "Whatever
may have been the origin of the practice, and whether or
not it was based on the soundest principles, it became
firmly settled, and it is now too late to question its valid-
ity. . . . It would undoubtedly be far more satisfac-
tory to have a uniform law regulating such liens, but until
such a law be adopted (supposing Congress to have the
power) the authority of the States to legislate on the sub-
ject seems to be conceded by the uniform course of deci-
sions."

Again, in *Workman* v. *New York City*, 179 U. S. 552, which, like *The Lottawanna*, was a proceeding in admiralty, the court, in quoting the declarations contained in that case respecting the general operation of the maritime law throughout the navigable waters of the United States, was dealing only with its application in the courts of admiralty. This is plain from what was said as a preface to the discussion (p. 557): "In examining the first question, that is, whether the local law of New York must prevail, though in conflict with the maritime law, it must be borne in mind that the issue is not—as was the case in *Detroit* v. *Osborne* (1890), 135 U. S. 492—whether the local law governs as to a controversy arising in the courts of common law or of equity of the United States, but does the local law, if in conflict with the maritime law, control a court of admiralty of the United States in the administration of maritime rights and duties, although judicial power with respect to such subjects has been expressly conferred by the Constitution (Art. III, sec. 2) upon the courts of the United States."

In the argument of the present case and companion cases, emphasis was laid upon the importance of uniformity in applying and enforcing the rules of admiralty and maritime law, because of their effect upon interstate and foreign commerce. This, in my judgment, is a matter to be determined by Congress. Concurrent jurisdiction and optional remedies in courts governed by different systems of law were familiar to the framers of the Constitution, as they were to English-speaking peoples generally. The judicial clause itself plainly contemplated a jurisdiction concurrent with that of the state courts in other controversies. In such a case, the option of choosing the jurisdiction is given primarily for the benefit of suitors, not of defendants. For extending it to defendants, removal proceedings are the appropriate means.

Certainly there is no greater need for uniformity of

adjudication in cases such as the present than in cases arising on land' and affecting the liability of interstate carriers to their employees. And, although the Constitution contains an express grant to Congress of the power to regulate interstate and foreign commerce, nevertheless, until Congress had acted, the responsibility of interstate carriers to their employees for injuries arising in interstate commerce was controlled by the laws of the States. This was because the subject was within the police power, and the divergent exercise of that power by the States did not regulate, but only incidentally affected, commerce among the States. *Sherlock* v. *Alling*, 93 U. S. 99, 103; *Second Employers' Liability Cases*, 223 U. S. 1, 54. It required an act of Congress (Act of April 22, 1908, c. 149, 35 Stat. 65) to impose a uniform measure of responsibility upon the carriers in such cases. So, it required an act of Congress (the so-called Carmack Amendment to the Hepburn Act of June 29, 1906, c. 3591, 34 Stat. 584, 595) to impose a uniform rule of liability upon rail carriers for losses of merchandise carried in interstate commerce. *Adams Express Co.* v. *Croninger*, 226 U. S. 491, 504. In a great number and variety of cases state laws and policies incidentally affecting interstate carriers in their commercial operations have been sustained by this court, in the absence of conflicting legislation by Congress. Among them are: Laws requiring locomotive engineers to be examined and licensed by the state authorities, *Smith* v. *Alabama*, 124 U. S. 465, 482; requiring such engineers to be examined for defective eyesight, *Nashville, Chattanooga & St. Louis Ry.* v. *Alabama*, 128 U. S. 96, 100; requiring telegraph companies to receive dispatches and transmit and deliver them diligently, *Western Union Telegraph Co.* v. *James*, 162 U. S. 650; forbidding the running of freight trains on Sunday, *Hennington* v. *Georgia*, 163 U. S. 299, 304, 308, etc.; regulating the heating of passenger cars, *New York, New Haven & Hartford R. R. Co.* v. *New York*, 165 U. S.

628; prohibiting a railroad company from obtaining by contract an exemption from the liability which would have existed had no contract been made, *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Solan,* 169 U. S. 133, 136, 137; a like result arising from rules of law enforced in the state courts in the absence of statute, *Pennsylvania R. R. Co.* v. *Hughes,* 191 U. S. 477, 488, 491; statutes prohibiting the transportation of diseased cattle in interstate commerce, *Missouri, Kansas & Texas Ry. Co.* v. *Haber,* 169 U. S. 613, 630, 635; *Reid* v. *Colorado,* 187 U. S. 137, 147, 151; statutes requiring the prompt settlement of claims for loss or damage to freight, applied incidentally to interstate commerce, *Atlantic Coast Line R. R. Co.* v. *Mazursky,* 216 U. S. 122, even since the passage of the Carmack Amendment, *Missouri, Kansas & Texas Ry. Co.* v. *Harris,* 234 U. S. 412, 417, 420; statutes regulating the character of headlights used on locomotives employed in interstate commerce, *Atlantic Coast Line R. R. Co.* v. *Georgia,* 234 U. S. 280; *Vandalia R. R. Co.* v. *Public Service Commission,* 242 U. S. 255. All these cases affected the responsibility of interstate carriers. Until now, Congress has passed no act concerning their responsibility for personal injuries sustained by passengers or strangers, or for deaths resulting from such injuries, so that these matters still remain subject to the regulation of the several States. We have held recently that even the anti-pass provision of the Hepburn Act (34 Stat. 584, 585, c. 3591, § 1) does not deprive a party who accepts gratuitous carriage in interstate commerce with the consent of the carrier, in actual but unintentional violation of the prohibition of the act, of the benefit and protection of the law of the State imposing upon the carrier a duty to care for his safety; *Southern Pacific Co.* v. *Schuyler,* 227 U. S. 601, 612.

In the very realm of navigation, the authority of the States to establish regulations effective within their own borders, in the absence of exclusive legislation by Con-

gress, has been recognized from the beginning of our government under the Constitution. As to pilotage regulations, it was recognized by the First Congress (Act of August 7, 1789, c. 9, § 4, 1 Stat. 53, 54; Rev. Stats., § 4235), and this court, in many decisions, has sustained local regulations of that character. *Cooley* v. *Board of Wardens,* 12 How. 299, 320; *Steamship Co.* v. *Joliffe,* 2 Wall. 450, 459; *Ex parte McNiel,* 13 Wall. 236, 241; *Wilson* v. *McNamee,* 102 U. S. 572; *Olsen* v. *Smith,* 195 U. S. 332, 341; *Anderson* v. *Pacific Coast S. S. Co.,* 225 U. S. 187, 195.

It is settled that a State, in the absence of conflicting legislation by Congress, may construct dams and bridges across navigable streams within its limits, notwithstanding an interference with accustomed navigation may result. *Willson* v. *Black-Bird Creek Marsh Co.,* 2 Pet. 245, 252; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Pound* v. *Turck,* 95 U. S. 459; *Escanaba Co.* v. *Chicago,* 107 U. S. 678, 683; *Cardwell* v. *American Bridge Co.,* 113 U. S. 205, 208; *Hamilton* v. *Vicksburg, Shreveport & Pacific Railroad,* 119 U. S. 280; *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1, 8; *Lake Shore & Michigan Southern Ry. Co.* v. *Ohio,* 165 U. S. 365; *Manigault* v. *Springs,* 199 U. S. 473, 478.

So, as to harbor improvements, *County of Mobile* v. *Kimball,* 102 U. S. 691, 697; improvements and obstructions to navigation, *Huse* v. *Glover,* 119 U. S. 543, 548; *Leovy* v. *United States,* 177 U. S. 621, 625; *Cummings* v. *Chicago,* 188 U. S. 410, 427; inspection and quarantine laws, *Gibbons* v. *Ogden,* 9 Wheat. 1, 203; wharfage charges, *Packet Co.* v. *Keokuk,* 95 U. S. 80; *Packet Co.* v. *Catlettsburg,* 105 U. S. 559, 563; *Transportation Co.* v. *Parkersburg,* 107 U. S. 691, 702; *Ouachita Packet Co.* v. *Aiken,* 121 U. S. 444, 447; tolls for the use of an improved waterway, *Sands* v. *Manistee River Improvement Co.,* 123 U. S. 288, 295.

So, of provisions fixing the tolls for transportation upon an interstate ferry, *Port Richmond &c. Ferry Co.* v. *Hudson County,* 234 U. S. 317, 331; or upon vessels plying be-

tween two ports located within the same State, *Wilmington Transportation Co.* v. *California Railroad Commission*, 236 U. S. 151, 156.

In each of these cases, except the last, which related to intrastate transport, the state regulation had an incidental effect upon the very conduct of navigation in interstate or foreign commerce. If in such cases the States possess the power of regulation in the absence of inconsistent action by Congress, much more clearly do they possess that power where Congress is silent, with respect to a liability which arises but casually, through the accidental injury or death of an employee engaged in a maritime occupation.

Indeed, with respect to injuries that result in death, it already is settled that although the general maritime law, like the common law, afforded no civil remedy for death by wrongful act (*The Harrisburg*, 119 U. S. 199; *The Alaska*, 130 U. S. 201, 209), yet a right of action created by statute is enforceable in a state court although the tort was committed upon navigable water (*Steamboat Co.* v. *Chase*, 16 Wall. 522, 533; *Sherlock* v. *Alling*, 93 U. S. 99, 104), and the liability arising out of a state statute in such a case will be recognized and enforced in the admiralty (*The Hamilton*, 207 U. S. 398), although not by proceeding *in rem* unless the statute expressly creates a lien (*The Corsair*, 145 U. S. 335, 347).

In *Sherlock* v. *Alling, supra,* which was an action in a state court and based upon a state statute to recover damages for a death by wrongful act occurring in interstate navigation, it was contended that the statute could not be applied to cases where the injury was caused by a marine tort, without interfering with the exclusive regulation of commerce vested in Congress. The court, after declaring that any regulation by Congress, or the liability for its infringement, would be exclusive of state authority, proceeded to say, by Mr. Justice Field (93 U. S. 104): "But with reference to a great variety of matters touching the

rights and liabilities of persons engaged in commerce, either as owners or navigators of vessels, the laws of Congress are silent, and the laws of the State govern. The rules for the acquisition of property by persons engaged in navigation, and for its transfer and descent, are, with some exceptions, those prescribed by the State to which the vessels belong; and it may be said, generally, that the legislation of a State, not directed against commerce or any of its regulations, but relating to the rights, duties, and liabilities of citizens, and only indirectly and remotely affecting the operations of commerce, is of obligatory force upon citizens within its territorial jurisdiction, whether on land or water, or engaged in commerce, foreign or interstate, or in any other pursuit. In our judgment, the statute of Indiana falls under this class. Until Congress, therefore, makes some regulation touching the liability of parties for marine torts resulting in the death of the persons injured, we are of opinion that the statute of Indiana applies," etc.

I deem *The Hamilton, supra,* to be a controlling authority upon the question now presented. It was there held, not only that the constitutional grant of admiralty jurisdiction, followed and construed by the Judiciary Act of 1789, leaves open the common-law jurisdiction of the state courts over torts committed at sea, but also that it leaves the States at liberty to change the law respecting such torts by legislation, as by a statute creating a liability for death by wrongful act, which was the particular legislation there in question.

To what extent uniformity of decision should result from the grant of jurisdiction to the courts of the United States concurrent with that of the state courts, is a subject that repeatedly has been under consideration in this court, but it never has been held that the jurisdictional grant required state courts to conform their decisions to those of the United States courts. The doctrine clearly

deducible from the cases is that in matters of commercial law and general jurisprudence, not subject to the authority of Congress or where Congress has not exercised its authority, and in the absence of state legislation, the federal courts will exercise an independent judgment and reach a conclusion upon considerations of right and justice generally applicable, the federal jurisdiction having been established for the very purpose of avoiding the influence of local opinion; but that where the State has legislated, its will thus declared is binding, even upon the federal courts, if it be not inconsistent with the expressed will of Congress respecting a matter that is within its constitutional power. The doctrine concedes as much independence to the courts of the States as it reserves for the courts of the Union. *Burgess* v. *Seligman,* 107 U. S. 20, 33, 34; *East Alabama Ry. Co.* v. *Doe,* 114 U. S. 340, 353; *Gibson* v. *Lyon,* 115 U. S. 439, 446; *Anderson* v. *Santa Anna,* 116 U. S. 356, 362; *Baltimore & Ohio R. R. Co.* v. *Baugh,* 149 U. S. 368, 372; *Folsom* v. *Ninety-six,* 159 U. S. 611, 625; *Stanly County* v. *Coler,* 190 U. S. 437, 444; *Kuhn* v. *Fairmont Coal Co.,* 215 U. S. 349, 357, 360.

In *Baltimore & Ohio R. R. Co.* v. *Baugh, supra,* the court had under review the judgment of a circuit court of the United States in an action by a locomotive fireman injured through negligence of the engineer. The cause of action arose in the State of Ohio, and the question presented was whether the engineer and fireman were fellow-servants. Under the decisions of the Ohio courts they were, but this court held that, as there was no state statute, the question should not be treated as a question of local law, to be settled by an examination merely of the decisions of the state court of last resort, but should be determined upon general principles; the courts of the United States being under an obligation to exercise an independent judgment. The court, by Mr. Justice Brewer, said (149 U. S. 378): "There is no question as to

the power of the States to legislate and change the rules of the common law in this respect as in others; but in the absence of such legislation the question is one determinable only by the general principles of that law. Further than that, it is a question in which the nation as a whole is interested. It enters into the commerce of the country. Commerce between the States is a matter of national regulation, and to establish it as such was one of the principal causes which led to the adoption of our Constitution."

In other words, the general effect of the question upon interstate commerce rendered it one of the class that called for the application of general principles; nevertheless, state legislation would be controlling—in the absence of valid legislation by Congress, of course.

In *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Solan, supra,* the doctrine was concisely stated by Mr. Justice Gray, speaking for the court, as follows (169 U. S. 136): "The question of the right of a railroad corporation to contract for exemption from liability for its own negligence is, indeed, like other questions affecting its liability as a common carrier of goods or passengers, one of those questions not of merely local law, but of commercial law or general jurisprudence, upon which this court, in the absence of express statute regulating the subject, will exercise its own judgment, uncontrolled by the decisions of the courts of the State in which the cause of action arises. But the law to be applied is none the less the law of the State; and may be changed by its legislature, except so far as restrained by the constitution of the State or by the Constitution or laws of the United States."

I freely concede the authority of Congress to modify the rules of maritime law so far as they are administered in the federal courts, and to make them binding upon the courts of the States so far as they affect interstate or international relations, or regulate "commerce with foreign

nations, and among the several States, and with the Indian tribes." What I contend is that the Constitution does not, *proprio vigore*, impose the maritime law upon the States except to the extent that the admiralty jurisdiction was exclusive of the courts of common law before the Constitution; that is to say, in the prize jurisdiction, and the peculiar maritime process *in rem;* and that as to civil actions *in personam* having a maritime origin, the courts of the States are left free, except as Congress by legislation passed within its legitimate sphere of action may control them; and that Congress, so far from enacting legislation of this character, has from the beginning left the state courts at liberty to apply their own systems of law in those cases where prior to the Constitution they had concurrent jurisdiction with the admiralty, for the saving clause in the Judiciary Act necessarily has this effect.

Surely it cannot be that the mere grant of judicial power in admiralty cases, with whatever general authority over the subject matter can be raised *by implication*, can, in the absence of legislation, have a greater effect in limiting the legislative powers of the States than that which resulted from the *express* grant to Congress of an authority to regulate interstate commerce,—the limited effect of which, in the absence of legislation by Congress, we already have seen. The prevailing opinion properly holds that, under the circumstances of the case at bar, although plaintiff in error was engaged in interstate commerce, and the deceased met his death while employed in such commerce, the provisions of the Federal Employers' Liability Act (April 22, 1908, c. 149, 35 Stat. 65) do not apply, because they cover only railroad operations and work connected therewith, whereas the deceased was employed upon an ocean-going ship. In effect it holds also that in the absence of applicable legislation by Congress the express grant of authority to regulate such commerce, as contained in the Constitution, does not exclude the operation of the

state law. It seems to me a curious inconsistency to hold, at the same time, that the rules of the maritime law exclude the operation of a state statute without action by Congress, although the Constitution contains no express grant of authority to establish rules of maritime law, and the authority must be implied from the mere constitutional grant of judicial power over the subject matter; and most remarkable that this result is reached in the face of the fact that the judicial power in cases of admiralty jurisdiction has been put into effect by Congress subject to an express reservation of the previous concurrent jurisdiction of the courts of law over actions of this character. This, besides ignoring the reservation, gives a greater potency to an implied power than to a power expressly conferred.

The effect of the present decision cannot logically be confined to cases that arise in interstate or foreign commerce. It seems to be thought that the admiralty jurisdiction of the United States has limits coextensive with the authority of Congress to regulate commerce. But this is not true. The civil jurisdiction in admiralty in cases *ex contractu* is dependent upon the subject matter; in cases *ex delicto* it is dependent upon locality. In cases of the latter class, if the cause of action arise upon navigable waters of the United States, even though it be upon a vessel engaged in commerce wholly intrastate, or upon one not engaged in commerce at all, or (probably) not upon any vessel, the maritime courts have jurisdiction. *Propeller Genessee Chief* v. *Fitzhugh,* 12 How. 443, 452; *The Propeller Commerce,* 1 Black, 574, 578, 579; *The Belfast,* 7 Wall. 624, 636, 638, 640; *Ex parte Boyer,* 109 U. S. 629, 632; *In re Garnett,* 141 U. S. 1, 15, 17. It results that if the constitutional grant of judicial power to the United States in cases of admiralty and maritime jurisdiction is held by inference to make the rules of decision that prevail in the courts of admiralty binding *proprio vigore* upon

state courts exercising a concurrent jurisdiction in cases of maritime origin, the effect will be to deprive the several States of their police power over navigable waters lying wholly within their respective limits, and of their authority to regulate their intrastate commerce so far as it is carried upon navigable waters.

The following additional consideration is entitled to great weight: The same Judiciary Act which in its 9th section conferred upon the district courts of the United States original cognizance of civil causes of admiralty and maritime jurisdiction, saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it, in its 25th section allowed a writ of error from this court to review the final judgment or decree of a state court of last resort resulting from a decision overruling any special claim of right, privilege, or exemption based upon the construction of any clause of the Constitution or statutes of the United States. By later legislation the review was broadened (Act of February 5, 1867, c. 28, § 2, 14 Stat. 385, 386; § 709, Rev. Stats.; § 237, Jud. Code), and by recent legislation the writ of certiorari has been substituted for the writ of error in many cases (Act of September 6, 1916, c. 448, 39 Stat. 726). But, at all times, the right to review in this court the decisions of the state courts upon questions of federal law has existed, so that if by the true construction of Art. III, § 2, of the Constitution, or of § 9 of the Judiciary Act of 1789, it had been the right of parties suing or sued in state courts upon causes of action of a maritime nature to insist that their cases should be determined according to the rules of decision found in the law maritime, this right or immunity might have been asserted as a federal right, and its denial made the ground of a review of the resulting judgment, under a writ of error (or, now, a writ of certiorari), from this court to the state court of last resort. Yet, until the present case, and others submitted

at the same time, the reported decisions of this court show, not a trace of any such question raised. I can conceive of no stronger evidence to prove that from the foundation of the government until the present time it has been the opinion of the Bar and of the Judiciary, in the state courts as well as in the courts of the United States, that it was not the right of parties suing or sued in state courts of law or equity upon causes of action arising out of maritime affairs, to have them decided according to the principles that would have controlled the decision had the suits been brought in the admiralty courts.

There is no doubt that, throughout the entire life of the nation under the Constitution, state courts not only have exercised concurrent jurisdiction with the courts of admiralty in actions *ex contractu* arising out of maritime transactions, and in actions *ex delicto* arising upon the navigable waters, but that in exercising such jurisdiction they have, without challenge until now, adopted as rules of decision·their local laws and statutes, recognizing no obligation of a federal nature to apply the law maritime. State courts of last resort, in several recent cases, have had occasion to consider the precise contention now made by plaintiff in error, and upon full consideration have rejected it. *Lindstrom* v. *Mutual Steamship Co.*, 132 Minnesota, 328; *North Pacific S. S. Co.* v. *Industrial Accident Commission* [Cal.], 163 Pac. Rep. 199; *Kennerson* v. *Thames Towboat Co.*, 89 Connecticut, 367, 373. See also *Matter of Walker* v. *Clyde Steamship Co.*, 215 N. Y. 529, 531; *Matter of Jensen* v. *Southern Pacific Co.*, 215 N. Y. 514 (this case). I have found no case to the contrary except a decision by the United States District Court for the Northern District of Ohio in *Schuede* v. *Zenith S. S. Co.*, 216 Fed. Rep. 566, now under consideration by this court. The reasoning is unsatisfactory, and it was repudiated in *Keithley* v. *North Pacific S. S. Co.*, 232 Fed. Rep. 255, 259.

I may remark, in closing, that there is no conflict be-

tween the New York Workmen's Compensation Act and the acts of Congress for limiting the liability of shipowners (Rev. Stats., §§ 4283–5; Act of June 26, 1884, c. 121, § 18, 23 Stat. 53, 57). So long as the aggregate liabilities of the owner, including that under the New York law, do not amount to as much as the interest of the owner in the vessel and freight pending, the act of Congress does not come into play. Where it does apply, it reduces all liabilities proportionally, under whatever law arising; the liability under the New York law along with the others. *Butler* v. *Boston & Savannah Steamship Co.*, 130 U. S. 527, 552, 558; *The Hamilton*, 207 U. S. 398, 406; *Richardson* v. *Harmon*, 222 U. S. 96, 104, 105.

MR. JUSTICE BRANDEIS and MR. JUSTICE CLARKE concur in the dissent, both upon the grounds stated by MR. JUSTICE HOLMES and upon those stated by MR. JUSTICE PITNEY.