ROHDE v. GRANT SMITH–PORTER SHIP CO.

(District Court, D. Oregon. January 26, 1920.)

No. L–8405.

1. ADMIRALTY ⬦⫸2—REMEDY GIVEN BY WORKMEN'S COMPENSATION ACT NOT EXCLUSIVE.

Under Judicial Code, §§ 24 (3), 256 (3), vesting in the federal courts exclusive jurisdiction of civil causes of admiralty, and maritime jurisdiction, as amended by Act Oct. 6, 1917, §§ 1, 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 991 [3], 1233), by adding the provision "saving * * * to claimants the rights to remedies under the workmen's compensation

law of any state," the remedy given by such a law is not exclusive of that in the admiralty courts, but the suitor has his election.

**2.** MASTER AND SERVANT ⊸116(1)—SHIPOWNER LIABLE FOR INJURY TO WORK-MAN BY INSECURE SCAFFOLD PROVIDED FOR CONSTRUCTION WORK.

The shipowner *held* under duty to see that a plank put up as a scaffold for libelant and another to stand on while building a bulkhead was made safe for their use, and liable for libelant's injury through falling of the plank by slipping from a narrow cleat against the side of the vessel upon which one end rested.

**3.** ADMIRALTY ⊸2—"SAVING TO SUITORS THEIR COMMON-LAW REMEDIES."

The phrase "saving to suitors their common-law remedies," as used in Judicial Code, § 24(3), section 256, as amended by Act Oct. 6, 1917, §§ 1, 2 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 991 [3], 1233), means that the remedy at common law is accorded to suitors, as well as their remedy in admiralty, that the remedies are concurrent, and either may be adopted at the choice of the claimant.

In Admiralty. Suit by Herman F. Rohde against the Grant Smith-Porter Ship Company. Decree for libelant.

See, also, 259 Fed. 304.

Lee Roy E. Keeley and W. S. U'Ren, both of Portland, Or., for libelant.

Carey & Kerr, Charles A. Hart, and H. B. Beckett, all of Portland, Or., for respondent.

WOLVERTON, District Judge. [1] This is a libel on the part of Herman F. Rohde to recover against Grant Smith-Porter Ship Company for personal injuries sustained on board ship while in discharge of his employment as a laborer in completing the interior of the ship while afloat. Respondent by its answer has set up the industrial accident statute of Oregon as a complete bar to any proceeding in admiralty by libel in rem for recovery for personal injuries so sustained. The cause has been submitted upon its merits, but it is still insisted that the local statute has superseded libelant's remedy in admiralty. I will address myself to the basic question thus propounded.

The question has previously been determined by Judge Bean adversely to the contention, on exceptions to the libel, and, but for the strenuous and elaborate argument of counsel in their brief, my conclusion might well rest upon his decision. After a very careful study of the subject, I find myself in accord with his judgment.

It should be premised that neither libelant nor respondent had, prior to the time libelant sustained his injury or to the institution of this libel, elected not to become subject to the provisions of the industrial accident statute, and it is suggested that, within the spirit of that act, libelant's sole remedy lies within its purview.

The Congress has heretofore, in pursuance of its authority under the Constitution, extended to the District Courts of the United States original jurisdiction of all civil causes of admiralty and maritime jurisdiction, saving to suitors in all cases the right of a common-law remedy when the common law is competent to give it. Judicial Code, § 24 (Comp. St. § 991). By section 256 of the Code (section 1233), this

admiralty and maritime jurisdiction in the District Courts is made exclusive of the courts of the several states.

It was held by the Supreme Court, in Southern Pacific Co. v. Jensen, 244 U. S. 205, 37 Sup. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900, having in view the provisions of the federal law and the constitutional provisions by authority of which the law was enacted, that the Workmen's Compensation Act of New York (Consol. Laws, c. 67), a statute similar in so far as it affects the present controversy to the Oregon industrial accident statute, was invalid as in contravention of the essential purposes of such act of Congress and working material prejudice to the characteristic features of the general maritime law; that as so applied it was in conflict with the Constitution, and to that extent invalid. It was further held that the remedy given and provided by the New York Workmen's Compensation Act is one unknown to the common law and incapable of enforcement by the ordinary process of any court, and hence is not among the common-law remedies which are saved to suitors from the exclusive admiralty jurisdiction by the Judicial Code.

By an act of Congress of October 6, 1917, amendatory of sections 24 and 256 of the Judicial Code (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 991[3], 1233), the saving clause also extended "to claimants the rights and remedies under the workmen's compensation law of any state." Undoubtedly the amendment of the statute was suggested by the Jensen Case, and Congress must have designed to obviate some restriction which that case imposed upon the law as it then stood.

[3] What is meant by the clause "saving to suitors their common-law remedies" is well understood. It is simply that the remedy at common law is accorded to suitors, as well as their remedy in admiralty. The remedies are concurrent, and either may be adopted at the choice and will of the claimant. The remedy in admiralty is not at all impinged upon nor impaired by the right accorded to the suitor to avail himself of the common-law remedy. There is a controversy as to just how far the general maritime law may be changed or modified by state legislation, and how far local statutory remedies or regulations may be adopted and become controlling as regulations in admiralty practice and procedure.

Obviously, it was the purpose of Congress, by the extension of the saving clause so as to save to claimants the rights and remedies under a workmen's compensation law of any state, to give scope, potency, and effect to such laws. But, in saving to suitors this added relief, was it the purpose of Congress to do more, or was the purpose to accord a remedy exclusive of all others, including that in admiralty, where the local law purports to make such rights and remedies wholly exclusive? The amendatory act of Congress does not by any explicit language employed purport to trench upon or circumscribe in any way the original admiralty jurisdiction. If it has done so at all, it is only by implication and interpretation, having in view the attending circumstances and conditions whereby the local statutes have been,

in effect, read into and become a part of the amendatory act. The simple conditions are, as is already apparent, that the Supreme Court declared the rights and remedies accorded by the New York Workmen's Compensation Act invalid, as inimical to the exclusive admiralty jurisdiction. The effect of the amendatory act was to validate such local statutes. That is to say, referring to the Jensen Case, if that case were now a new one, and Jensen's widow and heirs were insisting upon their claim and demand as awarded by the Workmen's Compensation Commission, and it was to be determined whether they were entitled thereto as against the Southern Pacific Company, I assume that the Compensation Act would no longer be held to be unconstitutional and in conflict with the general maritime jurisdiction. But, were the claimants insisting upon a demand for personal injuries sustained by the husband and father in admiralty, a very different question would be presented. The question would then be whether the New York Compensation Act would preclude the claimants from proceeding in admiralty. Such is the crucial inquiry here.

By the local law, where the workman, as here, has not elected not to become subject to its provisions, he is virtually accorded no other remedy whatsoever; and it is insisted that, having been foreclosed of any remedy, except as he is accorded such under the Compensation Act, he is also precluded from a resort to admiralty. The proposition is far-reaching, and if carried to its legitimate and logical conclusion would seem to place the legislative authority of the state above that of Congress in dealing with a jurisdiction which is wholly referable to the federal Constitution. The local Legislature might as well attempt to say by positive and emphatic edict that the only remedy a claimant or suitor shall have for any personal injury sustained is by common law or local statutory action. Thus, if counsel's contention is sound, the clause saving to suitors the common-law remedy would afford warrant of authority to a local Legislature to enact just such a declaration, and thus effectually supersede all admiralty and maritime jurisdiction accorded and reserved to the federal courts under the Constitution and the laws of Congress. Such is obviously not the intendment of the federal statute; and if not in such a case it is inconceivable how the local law, in view of the further saving to claimants of the rights and remedies under the workmen's compensation laws, can supersede or preclude all remedy in admiralty and maritime jurisdiction. Congress assuredly did not intend any such bold and fatal invasion of admiralty and maritime jurisdiction, as theretofore established and ever since maintained and upheld. The principle, therefore, which was applied in the Jensen Case, to the effect that the Workmen's Compensation Act of New York could not be suffered to encroach upon and delimit the admiralty and maritime jurisdiction accorded to the federal courts under the Constitution and the acts of Congress enacted in pursuance thereof, is still applicable here, and is determinative of the jurisdictional question presented.

With respect to the holding of the court in the Jensen Case that the New York Compensation Act is not among the common-law remedies

saved to suitors from the exclusive admiralty jurisdiction, the further saving under the amendatory act obviates the difficulty, as the latter act saves also to suitors the rights and remedies under workmen's compensation laws, and accords to such laws workable efficacy. I hold, therefore, that the amendatory act recognizes the remedies given by the compensation laws, in so far and to the extent only that such remedies are concurrent with such as are afforded in admiralty jurisdiction, and that the suitor has his election as to the jurisdiction in which he will proceed for recovery, applying the same rule as was formerly applicable under the original saving clause.

The suggestion that the local statute creates the only obligation for the negligent act of the ship, and gives the only remedy to which the claimant is entitled, to my mind overlooks the want of power in a state Legislature to encroach upon the legislative powers of Congress to fix and determine the delimitations of admiralty jurisdiction under the Constitution. I have not overlooked the very persuasive opinion of the learned District Judge in the case of The Howell, 257 Fed. 578, but in the light of the Jensen Case I am impelled to a different conclusion, as herein defined.

[2] The facts upon which the case turns are quite simple. The libelant and one Ray Shoop were directed by Ed. Anderson, the superintendent of the work, to put in a bulkhead in the ship. The bulkhead was in process of completion. The immediate work in hand was to raise heavy planks upright against supports and nail them fast thereto. A scaffold had been constructed, under the supervision of what was called the "Safety First" committee, for use to enable the workmen to put the planking up and make it fast. A plank had been devised for the workmen to stand upon while nailing the upright planks. This plank consisted of a board 2 inches thick by 12 inches in width. There is a dispute between libelant and Shoop as to whether there was more than one plank. Libelant thinks there were two, while Shoop maintains there was but one. It is probable there was but one. One end of this plank rested on a cleat, 2 by 4 inches by about 3 feet in length, nailed to the side of the ship, and the other upon a bracket fastened to a post. The libelant testifies that while at work upon the plank it fell with him, and he was precipitated to the floor beneath and received the injuries of which he complains. Shoop was not present at the time of the accident, having gone up to the dock to get some nails. When he returned, he found libelant lying on the floor unconscious.

Shoop testifies that, when he and libelant began work on the scaffold, they examined the plank and the method by which it was supported, to determine whether it was safe for use in prosecuting their work, and thought it to be necessary to drive a nail through the end of the board on the inside of and against the bracket, to prevent it from slipping endwise. This was done by the use of a forty-penny nail. It was supposed that the nail would make the plank safe for use. Libelant disagrees with Shoop. He says that he knew nothing of the nail being driven into the plank by Shoop, and that it must have been

done by Shoop while he was not present, and he denies that he had any conversation or consultation with Shoop with respect to the safety of the plank for use or with respect to driving the nail therein to make it safe. That the nail was put in the plank is quite certain, for it was found therein, but in a bent condition, after the accident. The end of the plank resting on the cleat had fallen therefrom, while the other end was still resting on the bracket. That the nail did not make the plank safe is proven by the fact that the end of the plank slipped off the cleat notwithstanding its use. The plank must have slipped from one of two causes: Either the nail was not driven snug against the bracket, or the nail itself was not of sufficient inflexibility to hold it rigid in place. That some sort of contrivance of the kind, or the use of a cleat under the plank and against the bracket, was necessary to keep it from slipping from the cleat nailed against the ship's side, is at once obvious and apparent, because of the very narrow surface upon which the end of the plank rested. The very arrangement of the plank for use by the workmen in carrying forward their work in putting up and making fast the upright planking in the bulkhead suggests that there was a lack of reasonable care and precaution on the part of those superintending the construction of the scaffold in making the plank safe for use. This was a work that it was the duty of the principal to perform and was nondelegable. Whoever did the work simply performed the duty of the principal.

Further defenses are interposed, namely: That the accident was the result of libelant's own negligence, in that the plank upon which he was working was placed in its insecure position by libelant himself, who failed to fasten it securely, so that it would not turn or move with his weight, and that the cause of such accident is attributable to the fault or neglect of fellow servants engaged with him in the work of constructing the bulkhead, in that libelant and his associates moved the plank to various positions without taking the proper precautions to make it secure for use.

The libelant and Shoop, the person with whom he was working at the time, differ materially as to the method pursued in putting up the planks for constructing the bulkhead. Shoop says that it was necessary to remove the plank on the scaffold when it was desired to put the full-length planks in perpendicular position for the bulkhead construction. The libelant testifies that such was not the case; that the long planks, as well as the short ones, were shoved up between the scaffold plank and the bulkhead, and thus put in a perpendicular position for securing them in completing the bulkhead. In his view, the scaffold plank sat out about two feet from the bulkhead, and thus permitted of sufficient room for shoving the bulkhead planks into perpendicular position without taking down or removing the staging plank. Whichever theory is the true one, the plank itself should have been so adapted that when it was put in place it would be safe for use. I am of opinion that the forty-penny nail driven in the plank at the bracket did not render it safe. The nail obviously allowed it to shift at the bracket end, and thus permitted it to tip at the other end, if drawn away

on either side from the cleat. The cleat upon which the plank was resting against the ship's side, it must be remembered, had a margin of only two inches, which was very narrow. Had a cleat been nailed on the underside of the staging plank snug up against the bracket, with the plank properly put down before use, no such shifting could have taken place, if it had to be removed for putting the bulkhead planks in place. It is probable that it was necessary so to move the plank for putting up the bulkhead planks, else we must assume that, for the sake of safety, it would have been nailed fast to the cleat at the ship's side. The plank, to my mind, was fundamentally insecure for the use that was to be made of it.

It is insisted that libelant must have attempted to climb upon the plank without using a ladder that was there to be employed for the purpose. When Shoop went to the dock, he says, he stood the ladder against the tunnel shaft, and that libelant was on the floor when he left. But libelant says he got the ladder when Shoop left, and with its use ascended and got upon the plank, and that it was while he was laying out a measurement for cutting a hole in the bulkhead that the plank gave way. At this point there is another disagreement between libelant and Shoop, for Shoop swears that when he returned from the dock the ladder was standing in the identical place where he left it. I am inclined, however, to believe libelant in this particular, as he was the only person present at the particular time, and knew, if any one did, how he got on the staging. The evidence fails, therefore, to charge libelant with negligence in readjusting the plank before attempting to use it, and from the fact that the adaptation of the plank was fundamentally insecure for use, it is the more reasonable to suppose that the accident was the result of negligence of the ship than of negligence of the libelant. Indeed, there is no evidence that libelant was negligent at all, except the barest inference that he did not properly readjust the plank before he went upon it to continue his work.

If Shoop, the fellow servant, was negligent in putting the nail in the plank, instead of using a cleat or employing some other proper method for making it safe for use, whether the libelant was there or not, he was but doing the work of the principal, and his negligence was that of the principal. It must be remembered that these men were put to work on a staging already constructed, not to build one, or even to repair it. It was only on finding it insecure, as they supposed, that they attempted to improve upon it, and in so doing they failed to make it safe. They should not be held to be guilty of a negligence which is properly imputable to the principal. No claim is made that the libelant assumed the risk of using the plank in its unsafe condition.

The libelant's injuries rendered him unconscious for some time. Surgical examination disclosed the fact that the first vertebra was fractured, and that the fracture has yielded somewhat to treatment. The libelant is able to move about some, but not to leave his room. He has had frequent spasms, continuing up to the time of the trial. The evidence seems to indicate that, while it is possible he may recover to such an extent as to enable him to do some kinds of lighter

work, it is probable his injuries are of a permanent nature, and that he will never be able to earn a competent livelihood.

As it relates to the damages sustained, I think it fair to take as a basis therefor the amount allowed under the Industrial Accident Act for permanent total disability, which is $30 per month. The libelant has, in effect, subscribed to this by not electing not to become subject to the act. The present value of such an annuity for 33 years, with a 6 per cent. interest basis, is $5,122.80. But to purchase an annuity of $360 for life will cost him $7,388.64. This, I consider, a fair sum in compensation for the disability suffered. To this should be added a reasonable amount as compensation for his suffering and the mental strain occasioned by his injury, and also what he has been required to expend in the way of hospital bills and for the services of physicians and nurses. The difference between the last-named sum and $10,000 is, to my mind, a reasonable amount to be allowed for these elements of damages. I therefore allow the libelant $10,000 as his reasonable damages for the injury sustained. Such an amount is probably about what a jury would have allowed, if the question had been submitted to their judgment. The D. S. Gregory, 7 Fed. Cas. No. 4100, is a case of some analogy.

Let a decree be entered accordingly.