**MARYLAND CASUALTY CO. v. TOUPS et al.**

No. 12397.

United States Court of Appeals Fifth Circuit.

Feb. 1, 1949.

[1] 330 U.S. 516, 517, 67 S.Ct. 847. See also Note 5, 330 U.S. 517, 67 S.Ct. page 847.

Charles S. Pipkin and Alto V. Watson, both of Beaumont, Tex., for appellant.

Quentin Keith, of Beaumont, Tex., for appellees.

Before HUTCHESON, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

Clifton James Toups was both captain and crew of the 46-foot vessel, Relief No. 1, of the Sabine Pilots Association. That association was engaged in supplying pilots to seagoing vessels that came into, and went out of, Port Arthur, Texas, through the waterways of Sabine Pass and Tributaries, and in furtherance of its business maintained, used, and operated certain docks and shore installations. Toups was not one of the pilots of large seagoing ships but only of Relief No.1 with which he took pilots out to meet the ships when they came in and brought them back when their pilotage had ended and their nautical charges had nosed out into the open sea. In addition to navigating and keeping up the Relief No. 1, Toups sometimes served as engineer on one of the association's larger vessels. But on the 17th day of October, 1946, while Relief No. 1 was undergoing some repairs, her skipper, under orders of his employer, was on a small dock of the association engaged in making fenders to hang over the side of his craft to cushion her against buffeting by the wharves and the big ships when she came alongside.

A witness some 150 feet away saw Toups moving up and down the dock, shortly thereafter heard a splash, and saw Toups in the channel floundering and struggling to grasp a ladder that reached from the water to the deck of the dock. The struggle was futile. The witness hastened to the scene but reached it barely in time to see Toups' finger tips as he sank beneath the water from which he was later taken as a corpse.

This witness testified:

"Q. Did anything happen to Clifton James Toups there on the morning of October 17, 1946? A. Yes. He fell overboard and drowned.

"Q. That was there at Sabine Pilots dock. A. That was right there at the docks, in the edge of the water.

\* \* \* \* \* \*

"Q. What first called to your attention Clifton James Toups when anything might have been happening to him? A. I heard a splash and I looked over and saw him floundering in the water.

"Q. By floundering in the water what do you mean? A. He left the impression on me that he wasn't able to swim."

Maryland Casualty Company had issued workmen's compensation insurance for Sabine Pilots under the statutes of Texas. It also carried some form of coverage of employees under the Harbor Workers' and Longshoremen's Act, 33 U.S.C.A. § 901 et seq., and some form of indemnity under the Jones Act, 46 U.S.C.A. § 688. After making an investigation of the death of Toups, the Casualty Company, then believing itself liable under the Texas Workmen's Compensation Law, Vernon's Ann.Civ.St.Art. 8306 et seq., made a payment thereunder in the amount of $80.00 to the widow of Toups,[1] but later concluding that Toups was engaged in maritime employment cognizable only in admiralty, and regulable only by Federal statute, it discontinued further payments and sought, in the Court below, to set aside an award by the Industrial Accident Board of Texas under the Workmen's Compensation Law. It undertook to defend on the theory that the Court had no jurisdiction of the subject matter since the contract of employment and the work that Toups was doing were maritime, and the locality of his death wholly within navigable waters of the United States. It contended, also, that there was no evidence to show that Toups received any accidental injury in the course of his employment and which resulted in his death. It was shown that Toups had been directed by his employer to make rope fenders for the protection of his boat, Relief No. 1. It was shown to be a part of the duty of the captain of Relief No. 1 to make and repair these fenders from time to time. Immediately prior to Toups' death

---

[1] Payments to the minor children were withheld pending receipt of Letters of Guardianship.

544

he was on his employer's dock, ostensibly making fenders as he had been directed to do. No other person was on the dock. There is no evidence as to how or why Toups fell in the water. There was no autopsy by which to reveal the physiological or pathological aspects relating to the cause of his death.

Five special issues requested by Defendant were submitted to the jury but due to the displeasure of the trial Judge as to the efforts of the Casualty Company to escape what he conceived to be its plain duty, the submissions were anteceded by statements of the trial Judge that were tantamount to directed verdicts on those issues.[2] The spe-

2 "They first say it ought to go under the Maritime Law, and in the second place as to who the judgment for damages or the award should be against would be against this association of pilots. And, as I say, of course, that is no remedy at all. That is no protection for anybody. While this contract of the Maryland Casualty Company ordinarily is—and I am surprised to see it repudiating its solemn contract that it went into and was paid for and lived under and recognized. Now, comes in here at the last minute, no, we are not responsible though I am rattling the money in my pocket that was paid me for this insurance. I am not liable. Now, you can have some imagination where that kind of judgment came from. I don't imagine it came from the regular executives of this Maryland Casualty Company, because the effect, the practical end of it is, you set it aside. Well, the suit is here. Who would it be against? Well, it would be against nobody. You would have to dismiss. What would you have to do next to get compensation for this death? You would have to sue the pilots association. And this is the only kind of insurance they carry and rely on. And, of course, it is a far reaching question that is up here. I simply hold that the Admiralty Law was not exclusively applicable in this case, because it appears from the circumstances that this man was working on the shore and working on the docks, and not on the water, not on maritime waters at all. The circumstances here indicate, too, that he was in the performance of his duties for his employer. It was in relation to his regular employment. Now, it has to be judged from circumstances just what he was doing when he fell, and nobody knows, nobody saw him, nobody can tell. He was there with this rope stretched out and making these—what you call them? These fillers or something.

\*　　\*　　\*　　\*　　\*　　\*

"In any event, if they have held as the Maryland Casualty Company would have me hold, if they already in the higher courts, Supreme Court or any other court, held that once, they will have to hold it again, because I am going to hold that this insurance company is liable. They were paid for this insurance, and

ought to pay this compensation benefit, ought to meet its obligation as it started out to do. You or I wouldn't feel very much like we had acted very honestly if we received pay to guarantee something to a fellow and after that a possible thing happened to him, we agreed that we would take care of all the injuries, that we had been paid for it, had the money in our pockets to do it, and finally we reached the conclusion that we are not going to pay any of it. I don't know what we would think about ourselves in such circumstances as the company here is putting itself, and really I am surprised that it would. So I an holding— whatever your motion is, I am overruling that motion and I am ready to hear the next one if there is any more.

\*　　\*　　\*　　\*　　\*　　\*

"But occasionally I feel it does become pertinent for the Court to make comments, and when I do I freely make them, but I never fail to tell the jury after I get through—a Judge of the United States Court can even argue a case like a lawyer. I never did. But he can do it if he wants to. Just so I tell the jurors at the finish here—I have made comments about this case and I want you to understand you are the exclusive judges of the facts, and I am the exclusive judge of the law. If these comments harmonize with your views, you can consider what I have said. If they don't, you can set them aside, not consider them at all. And that is what I say to you here. If any comments I have made,—I don't know where all I made comments, all the way through, if they harmonize with your views, why, you can take them into account and they are not excluded. But unless they do harmonize with your views, you can just treat them the same as if I never had said them, and reach your own verdict irrespective of them. And I advise you to do that in the event you disagree with them. Not pay any attention to them. And I will not specify how many times I may have commented. I don't know. I never paid any attention to it through the trial. Some I could refer to specifically. It doesn't make any difference when I made them. What I charge you is applicable to all of them, whenever I made them."

cial verdicts returned by the jury were: (1) that Toups sustained personal injuries on the date in question; (2) that the injury so sustained was accidental; (3) that the injury was sustained by Toups while working as an employee of Sabine Pilots; (4) that the injury sustained by Toups was in the course of his employment with Sabine Pilots; (5) that the injury sustained by Toups was the producing cause of his death.

Under these verdicts a judgment was entered against the Casualty Company for the payments specified by the State statutes. Motions for directed verdict, for mistrial, for judgment non obstante veredicto, and for a new trial were all overruled.

Appellant presents nine specifications of error, all but two of which relate to matters arising out of the trial. The two substantive contentions of the Appellant are: (1) that the Court had no jurisdiction of the case under the Workmen's Compensation Law of Texas because Toups' employment, work, and the place of death were maritime and not subject to the laws of the State of Texas; and (2) that there was no evidence to show that Toups sustained any accidental injury in the course of, and arising out of, his employment which, in a natural and continuous sequence, resulted in his death.

The answer to the first question of the Appellant has long been enshrouded by a fog of confusion. Sec. 2 of Art. III of the Constitution of the United States provides that: "The judicial Power shall extend * * * to all Cases of admiralty and maritime Jurisdiction; * * *." Sec. 9 of the Judiciary Act of 1789 provided that the District Courts should have original jurisdiction "of all civil causes of admiralty and maritime jurisdiction, saving to suitors in all cases the right of a common-law remedy where the common law is competent to give it".[3] In the present case the employment of the deceased was maritime in its nature as the captain and the crew of Relief No. 1. The work in which he was engaged at the time of his death was likewise maritime. The dock upon which he was working extended out into navigable waters of the United States and his death occurred in navigable waters of the United States.

The case of Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 529, 61 L. Ed. 1086, L.R.A.1918C, 451, Ann.Cas.1917E, 900, and numerous decisions of inferior courts subsequent thereto, furnish support for the contention that a court of admiralty would have exclusive jurisdiction of any case arising out of an injury to a seaman that was maritime in character and that had occurred on navigable waters of the United States. In that case the Court, in passing upon the applicability of the Workmen's Compensation Law of the State of New York to a stevedore injured while engaged in maritime employment, said:

"Equally well established is the rule that state statutes may not contravene an applicable act of Congress or affect the general maritime law beyond certain limits. They cannot authorize proceedings in rem according to the course in admiralty [citing cases]; nor create liens for materials used in repairing a foreign ship [citing cases]. And plainly, we think, no such legislation is valid if it contravenes the essential purpose expressed by an act of Congress, or *works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations.* This limitation, at the least, is essential to the effective operation of the fundamental purposes for which such law was incorporated into our national laws by the Constitution itself." (Emphasis supplied.)

Mr. Justice McReynolds, the author of the opinion in the Jensen case, later, in

---

[3] The jurisdiction provided by the Act of 1789, together with the amendments thereto, was continued as Sec. 41(3), 28 U.S. C.A., and was in effect at the time of the trial below. However, the revision of the U.S.Code which became effective September 1, 1948, provided that the District Courts of the United States should have original jurisdiction, exclusive of the Courts of the State, of: "(1) Any civil case of admiralty or maritime jurisdiction, saving to the libellant or petitioner in every case any other remedy to which he is otherwise entitled." 28 U.S.C.A. § 1333.

Millers' Indemnity Underwriters v. Braud, 270 U.S. 59, 46 S.Ct. 194, 195, 70 L.Ed. 470, considered the Texas Workmen's Compensation Law in its relation to a diver who died in the navigable waters of the Sabine River because of the lack of a sufficient supply of air to such diver. In that case the employer held a policy of insurance obligating the insurer to pay the compensation prescribed by the Texas Workmen's Compensation Act. The insurance company contended that the claim arose out of a maritime tort and that the rights and obligations were fixed by the maritime law, and that the State had no power to change the same by statute or otherwise. The contention was rejected, the Court saying:

"In the cause now under consideration the record discloses facts sufficient to show a maritime tort to which the general admiralty jurisdiction would extend save for the provisions of the state Compensation Act; *but the matter is of mere local concern and its regulation by the state will work no material prejudice to any characteristic feature of the general maritime law.* The act prescribes the only remedy; its exclusive features abrogate the right to resort to the admiralty court which otherwise would exist." (Emphasis supplied.)

In the case of Grant Smith-Porter Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 158, 66 L.Ed. 321, 25 A.L.R. 1008, we find the following statement:

"Under such circumstances regulation of the rights, obligations and consequent *liabilities of the parties, as between themselves, by a local rule would not necessarily work material prejudice to any characteristic feature of the general maritime law, or interfere with the proper harmony or uniformity of that law in its international or interstate relations.*" (Emphasis supplied.) See also Davis v. Department of Labor, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246.

The deceased, under the holdings of the Supreme Court in Norton v. Warner, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 430, was, no doubt, a seaman on a vessel engaged in navigation and in aid of navigation, whose heirs, in the absence of an applicable State Workmen's Compensation Act, would be remitted to the Jones Act for redress. But since an action under the Jones Act must be grounded upon negligence, and since in the present case no negligence of the employer can be shown, the heirs of the deceased would be without remedy under that Act or in admiralty. Such a result is not imperative unless the invocation of the State Compensation Act would "interfere with the proper harmony or uniformity of that law [admiralty] in its international or interstate relations." No inharmonious result is here possible. The deceased at the time of his death was working upon the dock making fenders for the use of his small boat. He hauled no interstate or foreign commerce. Neither his vessel nor his work affected the intricate relations that involve the ship, crew, master, owner, cargo, shipper, consignee, or responsibility, or lack of it, under the law of the sea. Neither the activity of the deceased nor the method of compensation agreed upon for his family could have interfered with the proper harmony or the uniformity of the law that prevails, and should prevail, in all substantial relations arising out of maritime commerce, whether interstate or international.

■ We conclude that the lower Court was not without jurisdiction to apply the Texas Workmen's Compensation Act to the facts in the present case.

The second question of substance presented by this appeal is whether or not there was any evidence to show that Toups sustained an accidental injury in the course of, and arising out of, his employment which, in natural and continuous sequence, resulted in his death.

The evidence is undisputed. Defendant offered no testimony as to how and why Toups' death occurred, and our inquiry, therefore, is whether or not the evidence, undisputed and unrebutted, makes out a prima facie case of accidental injury and death arising out of the course of the deceased's employment.

There is direct and unrebutted evidence of the following facts: (a) that Toups was put to work by his employer on the dock from which he fell into the water;

(b) that he had worked on the dock the day before in making fenders for the use of the boat of which he was the captain and the crew; (c) that early on the morning of his death he had a cup of coffee with the witness, Zenos, at the latter's place of employment, some 150 or 200 feet from the dock on which the deceased had been working; (d) that after drinking the coffee, deceased returned to the dock where he was seen by the witness, Zenos, moving up and down; (e) that the witness, Zenos, observed rope spread out on the dock in the manner customarily followed in the making of fenders; (f) that there was no one else on the dock with the deceased at the time of his falling overboard; (g) that Zenos, hearing a splash, looked and saw Toups struggling in the water, attempting to reach a ladder upon which he might have climbed back to safety; (h) that Zenos, observing Toups in the water, concluded that he could not swim, and hastened to the dock, but he arrived only in time to see the finger tips of the deceased sink beneath the water; (i) that when the body was removed from the water it was without life; (j) that according to this witness, Toups "fell overboard and drowned."

There is an absence of any evidence: (a) that the deceased was a sufferer from any ailment, or of any disease, of the type that might cause him suddenly to collapse or to fall overboard; (b) that the deceased had any disease that would have brought about his sudden death or that would have caused him to expire upon falling into the water; (c) of an autopsy; (d) of medical findings as to the cause of Toups' death; (e) of any basis for an hypothesis of suicide—as to which a presumption would exist to the contrary.

■ In resume:

(1) The deceased was on the premises of his employer at the point where he had been directed to be, and where, between the time of his direction and the time of his death, he had been engaged in the business of his employer in making fenders.

(2) Shortly before his death he was observed going up and down the wharf at the point where rope which he had used in making fenders for his boat was found to be laid out.

(3) He fell overboard into water in excess of thirty feet deep.

(4) He could not swim.

(5) He struggled vainly to reach a ladder that projected into the water whereby he could have rescued himself—thereby indicating no unconsciousness or purpose of self-destruction.

(6) He went under and did not rise again until his lifeless body was taken from the water.

(7) The only eye witness testified that Toups "fell overboard and drowned." [4]

■ These undisputed and unrebutted facts make out a prima facie case of accidental death occurring within the scope of the deceased's employment entitling his heirs to recover under the Texas Workmen's Compensation Act. These unrebutted and uncontradicted facts also entitled the claimants to a directed verdict on the issues of accidental injury and death arising out of Toups' employment.

■ We deem it unnecessary to pass upon the other specifications of error urged by the Appellant. We agree that the statements of the trial Judge in the presence of the jury, set forth in Footnote 2 hereinabove, would be improper and highly prejudicial in a case for the jury, and if there had been in evidence facts rebutting, or tending to rebut, the prima facie case made by the claimants, those remarks of the Judge in the presence of the jury would have required a reversal and a new trial, but in view of our conclusion that the undisputed evidence in the case entitled claim-

4 It is now urged that this statement was merely an opinion and, therefore, incompetent, but in addition to the fact that no objection was interposed at the time and no motion made to strike the statement of the witness, it would seem that it not only comes too late, but that it was more of a statement of facts with-in the personal knowledge of the witness than an express of his opinion. As a general rule an eye witness may testify directly to a composite fact even though his testimony may be the result of his conclusions from other facts. 19 Tex. Jur., p. 22, § 7.

548

ants to a directed verdict, the remarks of the trial Judge become immaterial since they could not have prejudiced the jury in a case not submissible to the jury, nor deprived the Appellant of any rights to which it was entitled under the law and the facts of the case.

The judgment is

Affirmed.