**HEIDI MORCHER, Plaintiff,**
**v.**
**MERRY NASH, in personam, and**
**the Oil Screw 'BISMARCK' in rem, Defendants.**

Civ. No. 1997-124

District Court for the District of the Virgin Islands

Division of St. Thomas and St. John

September 21, 1998

FREDERICK G. WATTS, ESQ., Watts & Benham, P.C., St. Thomas, VI, *For plaintiff.*

GREGORY H. HODGES, ESQ., Dudley, Topper & Feuerzeig, St. Thomas, VI, *For defendants.*

## MEMORANDUM OPINION

MOORE, *Chief Justice*

This is an action to determine the ownership of a pleasure craft. Plaintiff, Heidi Morcher ["Mrs. Morcher" or "plaintiff"], is the widow of one Kurt Morcher ["Morcher"], a German national who for the last years of his life resided in St. John with the defendant, Merry Nash ["Nash" or "defendant"], as his companion.

The Court has general jurisdiction equivalent with that of a district court of the United states pursuant to Revised Organic Act of 1954 ["Revised Organic Act" or "REV. ORG. ACT"] § 22(a), 48 U.S.C. § 1612(c).[1] The suit was pled as an action in admiralty in which case the Court would have specific jurisdiction under 28 U.S.C. § 1333.[2] Otherwise, there is diversity of citizenship between litigants contesting an amount in excess of the jurisdictional threshold in which event the Court has specific jurisdiction under *28 U.S.C. § 1332.*

This matter came on for trial to the Court sitting without a jury beginning February 17, 1998. The Court now enters its findings of fact and conclusions of law based upon the record developed at trial.

---

[1] The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1994), *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 73-177 (1995 & Supp. 1997) (preceding V.I. CODE ANN. tit. 1) ["Revised Organic Act" or "REV. ORG. ACT"].

[2] The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.
*28 U.S.C. § 1333(a).*

## I. FINDINGS OF FACT

Kurt Morcher was a wealthy German national who, together with his wife, constructed a vacation residence in Estate Chocolate Hole, St. John, sometime in the mid-1970's. From that time until about 1985 when Morcher retired from his business in Germany, the Morchers used this residence primarily as a vacation retreat. From 1985 until 1989 or 1990, the Morchers lived together in St. John on a more or less permanent basis.

Sometime in the late 1980's, Kurt Morcher met the defendant, Merry Nash ["Nash"], on St. John and struck up a friendship with her, which developed into a romantic, intimate relationship in 1989 or early 1990. Upon discovery of this affair, which was the last of several dalliances Mr. Morcher engaged in during the course of his marriage, Mrs. Morcher left St. John and returned to the family's home in Stuttgart, Germany in February, 1990.

From 1977 until early 1994, Kurt Morcher owned a 1977 twenty-eight foot twinscrew pleasure craft manufactured by Bertram yachts ["the Bertram"]. During this seventeen year period, the Bertram was registered in Morcher's sole name with the territorial government (No. VI 8777-T) and was permitted for mooring also in the sole name of Kurt Morcher.

From February, 1990, until his death September 22, 1995, on St. John, Morcher lived with Nash at the Chocolate Hole residence, spending virtually all his time on St. John. During this five-year period, Morcher returned to Germany only three times: to attend his son's wedding; to attend his granddaughter's confirmation; and to undergo surgery for cancer in December, 1993. During his convalescence from the surgery, Morcher called Nash to come to Germany and accompany him back to the Virgin Islands. Ms. Nash flew to Germany and stayed about eight days with Kurt Morcher in the Morcher family's Stuttgart home. She returned with him to St. John in January, 1994, which this was the last time Kurt Morcher set foot on German soil.

Earlier in the fall of 1993, Morcher and the defendant had begun discussing getting a new boat. After attending a boat show in Florida, Nash selected a vessel manufactured by Phoenix. As he had no particular preference, Morcher bought the Phoenix because Nash liked it so much. About November 1, 1993, Morcher placed

410

an order for the Phoenix following a visit with Nash to the manufacturer's facility. The purchase price for the craft was $140,770, of which, Morcher paid $40,000 on deposit. Thereafter, he paid the balance due and Phoenix Marine delivered a bill of sale dated February 11, 1994, to him.

On February 15, 1994, together with Nash, Morcher filed an application with the Virgin Islands government for a certificate of registration for the Phoenix to be able to bring the boat into Virgin Islands waters. Morcher received a special registration for the Phoenix (No. "213-F").[3] Morcher also at the same time received a renewed mooring permit with an expiration date of June 30, 1994.

Shortly after Kurt Morcher received the special registration to bring in the Phoenix and a mooring permit, he discussed with Nash their scheduled trip to take delivery of the boat in Florida and, together, bring the boat to St. John. Such a cruise was one of Morcher's long-time dreams. Morcher was concerned about his health and was convalescing from the surgery. The Court finds that Kurt Morcher wanted to make sure that Merry Nash got the new boat if something happened to him. To accomplish this result, Morcher prepared and signed a notarized document on February 22, 1994, conveying an ownership interest in the Phoenix to Nash. The text of this 'Bill of Sale' is as follows:

> In exchange for ten dollars and other good and valuable considerations, I, Kurt Morcher, hereby grant to Merry Nash co-ownership of my Phoenix-29, Bismarck, Hull # PMG48912B494. Title for said vessel shall now read Kurt Morcher or Merry Nash.

> /s/Kurt Morcher
> P.O. Box 1045
> St. John, V.I. 00831

---

[3] The Court rejects the suggestion that no mooring permit for the Phoenix was issued until March 2, 1994, as the exhibit showing this was an unsigned computer printout, and the issuing office was unable to explain it since Morcher already had a mooring permit for the Bertram and mooring permits are readily transferable when one buys a new boat. The Court attributes no significance to the 'F' added to the number because of the confusion in the issuing office at the time.

On that same day, the two applied for a certificate of registration as co-owners, "Kurt Morcher or Merry Nash," for the Phoenix and for a mooring permit. The Virgin Islands government issued the mooring permit and registered the boat under vessel number "VI 8601-TA."

In March, 1994, Kurt Morcher and Merry Nash took delivery of the Phoenix, now known as the Bismarck. Thereafter they prepared, supplied, and provisioned the vessel to carry out Kurt Morcher's dream of making a voyage from Florida to the Virgin Islands. Nash, being a licensed captain, was primarily responsible for planning, outfitting the trip and navigating Bismarck. Morcher was not a skilled open-water sailor and was, in any event, still convalescing from his December 1993, surgery. The voyage was successful and Bismarck arrived with her two passengers at St. John in April of 1994. Other than when on trips around St. John and the other Virgin Islands, the boat has since been kept at its mooring in Chocolate Hole.

Kurt Morcher and Merry Nash spent many happy days on the Bismarck together, sometimes bringing along friends from St. John. Three of those who were invited along testified that Morcher repeatedly referred to Nash as the "captain" of the boat. When these guests would offer thanks to Morcher for the pleasant voyage, he would often remark that they should thank Merry, for it was her boat. One friend in particular recalled several conversations in which Morcher stated explicitly that the Bismarck would belong to Nash when he died.

Except for a vacation trip she made to St. John with her male companion, Kurt Bauer, in the fall of 1994, Mrs. Morcher never returned to St. John and never lived together with Kurt Morcher as husband and wife after February of 1990. During that vacation, Mrs. Morcher and her paramour stayed in the Morcher home at Chocolate Hole; Kurt Morcher and Merry Nash stayed at Nash's home, also located on St. John. The only time Heidi Morcher has been aboard the Bismarck was during this vacation, when she and Kurt Bauer joined Morcher and Nash as their guests for day trips.

Plaintiff, her daughter Tina, her son Olaf, and her companion, Kurt Bauer, testified that Kurt Morcher told them he had to convey a small three percent interest in the Bismarck to Nash to be able to

get a mooring permit. Kurt Morcher may well have told them this for reasons of his own. Since he had held a mooring permit for the Bertram in his own name for several years, the Court rejects the idea Morcher was motivated to give Nash an interest in Bismarck so he could get a mooring permit.

The Court finds that, after they separated in 1990, Kurt Morcher and Heidi Morcher agreed implicitly that he would live his life with Merry Nash in St. John and Heidi Morcher would live an independent, comfortable life with the children in Stuttgart. Her comfort was assured by an agreement that she receive a stipend of DM 10,000 per month, payment of all her health insurance and living expenses, and a ski chalet in Austria. The cash payment was later increased to DM 11,000 per month.

During their five-year long relationship, Morcher and Nash lived together, vacationed together, and boated and fished always together. They lived, in all respects, as a couple in a loving and caring relationship. During the last two years of his life, when he was suffering with terminal cancer, it was Merry Nash who provided Kurt Morcher with love, care, support and comfort.

On September 18, 1995, four days before he died, Kurt Morcher executed a notarized instrument directing that his remains be cremated and that his ashes be released to "his beloved companion, Merry Nash." After his death, Nash carried out Morcher's instructions by taking his ashes, and with three of their mutual friends aboard the Bismarck, spreading them on the waters of Carribean Sea he loved so much.

On November 2, 1995, Nash attached a copy of Kurt Morcher's death certificate to an application for vessel registration and registered the Bismarck in her sole name. The Bismarck has been registered with the Virgin Islands government and permitted for mooring in sole name of Merry Nash ever since.

The defendant has been solely responsible for the care and maintenance of the Bismarck since Kurt Morcher's death. Nash testified she has spent approximately $10,000 on the vessel from September 22, 1995, until the date it was arrested and seized from its mooring without notice to her. At no time before or after Morcher's death did his widow demand possession of Bismarck or advise Nash that she claimed an interest in the boat. At no time

413

before or since Kurt Morcher's death has Heidi Morcher paid or offered to compensate Nash for any expense related to Bismarck.

## II. CONCLUSIONS OF LAW

During the course of trial, the Court dismissed Mrs. Morcher's Count I for conversion and Count II of Ms. Nash's counter-claim for wrongful arrest. All that remains is for the Court to exercise its equitable power to determine who has what right, title and interest in the Bismarck.

There had been some confusion whether this action lay in the Court's admiralty jurisdiction. With the full light of the record now before it, the Court has concluded this action does sound in maritime jurisdiction but its inherently local character mandates the application of Virgin Islands law to all its aspects. The Court first explains this conclusion then applies local law to decide the remaining claims of the parties to the Bismarck and to the question, raised by defendant's counsel, whether Nash is entitled to attorney fees under local law.

### A. Why This Action is "Maritime But Local"

State or in this case territorial law must generally yield to the policy preferring uniformity in the maritime law. *See Southern Pacific Co. v. Jensen*, 244 U.S. 205, 61 L. Ed. 1086, 37 S. Ct. 524 (1917). In a case such as this, however, the mere fact it is a maritime action, standing alone, does not mean that Virgin Islands law will play no part in the Court's decision.

In deciding a case such as the one at bar, the better reasoned authorities suggest a weighing of interests test. Federal courts may apply local law, and may even apply the law of a particular state or territory, on three conditions: 1) where there is no applicable admiralty rule; 2) where local interests predominate; and 3) where the uniformity principle is not crucial. 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 4-4, at 142-45 (2d ed. 1994) (explaining the "maritime but local" doctrine); *see also* Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 6-61, at 463 (2d ed. 1975) (where there is state but no federal rule, weigh state and federal interests and apply whichever predominates).

414

First, as frankly conceded by plaintiff in her post-trial brief on the issue of attorneys fees, there is no federal maritime rule for determining the ownership of a vessel under the facts of this case. Second, it seems local interests, either German or Virgin Islands, predominate. The parties to this dispute are either Virgin Islands or German domiciliaries. The documents in issue, the bill of sale for Bismarck and the German inheritance contract, are likewise either of Virgin Islands or German pedigree. The Bismarck is not employed for commercial purposes, but instead is a pleasure vessel used in local waters (although some of those are undoubtably foreign waters) and originates all its voyages in the waters of the U.S. Virgin Islands.

■ Lastly, we are not here faced with a party which is a multi-national or foreign shipping company nor a maritime underwriter who may have an interest in maintaining uniformity of law on this point. There are no foreign seamen here whose legitimate expectations to workplace safety or job protection must be considered. Based upon this analysis then, the Court concludes this case is "maritime but local." The Court is thus free to apply local law, including choice of law rules.

### B. What Law Shall Apply?

This still leaves the question somewhat unsettled. The Court must still decide when to apply Virgin Islands law and when, if at all, to apply German law.

Plaintiff has gone to great lengths to focus the Court's attention on her inheritance contract with Kurt Morcher. The inheritance contract is relevant only to the extent it prohibited Kurt Morcher from alienating interests in his after-acquired property. The Court has thoroughly examined the text of the inheritance contract and can find no limitation which would have prevented Kurt Morcher from selling all or part of his interest in the Bismarck to the defendant. Indeed the inheritance contract fully contemplates that some assets on hand when the contract was made may later be sold, and thus be unavailable for distribution to the Morcher heirs. (See Inheritance Contract Between Kurt A. Morcher and Heidi Morcher, nee Mayer at § 6aa) (Morchers' Stuttgart residence to be

devised to son Olaf and daughter Tina "providing it is still part of the estate on the death of the last surviving spouse").

So, asking first questions first, the Court is constrained initially to determine whether Kurt Morcher's estate received any interest in the Bismarck upon his death, as this is the only interest which may have succeeded to Heidi Morcher. Plaintiff points to section 2287 of the German Civil Code which prohibits gifts made to circumvent an inheritance contract. Plaintiff's expert on German law then gives his opinion that the bill of sale reciting $10 and other consideration for an interest in the Bismark is an obvious sham and is, in reality, a gift made to avoid the inheritance contract. Plaintiff argues forcefully for the application of German law to interpret the bill of sale. To no one's surprise, defendant argues for the application of local law.

In the Virgin Islands and in the absence of local statutory or judicial guidelines, the Restatements of the Law are to be applied by the courts. 1 V.I.C. § 4. Hence the Court will apply the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS ["RESTATEMENT"] to determine whether German or Virgin Islands law governs the evaluation of the bill of sale between Kurt Morcher and the defendant.

The applicable Restatement provision reads as follows:

> In the absence of an effective choice of law by the parties . . ., the contacts to be taken into account . . . to determine the law applicable to an issue include:
> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

RESTATEMENT § 188. The analysis mandated by the Restatement rapidly leads the Court to conclude that Virgin Islands law should be applied. The record reflects the bill of sale was made in the Virgin Islands and was negotiated here as well.

The factors of location of the subject matter and the place of performance were likewise centered in the Virgin Islands. While the boat was obtained from Florida, the contract was for the sale of

an interest to Merry Nash, who lived in the Virgin Islands and expected to enjoy her interest in the boat jointly with her companion Kurt Morcher from their base of operations at his home in Chocolate Hole. The Bismarck was to be moored there and no other locality was ever contemplated or reasonably could be suggested for the performance of this contract or location of its subject matter.

■ Merry Nash was and is a Virgin Islands domiciliary and United States national. Kurt Morcher's German nationality is the only factor which augers for application of any law other than local Virgin Islands. For the purpose of this analysis, Morcher otherwise was a Virgin Islands domiciliary. This is so because of his long-standing physical presence here and his manifest intent permanently to remain here.[4] See RESTATEMENT § 15 (domicile may be acquired by a person with legal capacity to change domicile by physical presence and a proper attitude of mind).[5] Because the Court can see only one factor begging for the application of German law to the contract, it will instead apply Virgin Islands law.

### C. Evaluating the Bill of Sale for Bismarck

There are two issues to be decided in this regard. First the Court will determine the validity of the bill of sale as a contract. It will next determine what interest in Bismarck, if any, the contract conveyed to the defendant.

---

[4] Kurt Morcher's intent to remain in the Virgin Islands could hardly be more clear. He spent all his time with his friends here in the Virgin Islands and only returned to Germany three times following his separation from his wife. Each was a brief visit followed by a prompt return to the Virgin Islands. Most telling is his last visit following his cancer surgery when, at the first moment he was convalescent, he sent for Merry Nash to escort him back to the Virgin Islands. Then too, just days before his death, he gave the clearest indication of his attachment to the Virgin Islands declaring that, after his death, his cremated remains were to be placed in the defendant's care to be spread on the waters surrounding the Virgin Islands per his earlier instructions.

[5] Plaintiff insists that Morcher, being a German national in the United States on a series of temporary visas lacked legal capacity to change his domicile. She mistakes legal concepts of alienage with domicile. Had Kurt Morcher gone to the trouble he could have obtained a resident alien visa or U.S. citizenship. That he was legally capable of doing so is the fact which makes him competent to change his domicile. That he never did so is a fact of no relevant legal moment.

417

### 1. *The Bill of Sale for Bismarck is a Valid Contract*

The appropriate law of the Virgin Islands to be applied is the Uniform Commercial Code ["UCC" or "the code"]. 11A V.I.C. § 1-105(1). UCC Section 2-102 makes the code applicable to contracts for the sale of goods and Bismarck is unquestionably goods as that term is understood in the UCC. See 11A V.I.C. § 2-105 ("Goods" means something which is "moveable at the time of identification to the contract for sale.") Relevant terms are further defined: "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price. 11A V.I.C. § 2-106(a). The passing of title is valid in any UCC contract when the goods are identified to the contract. 11A V.I.C. § 2-401(1). In the absence of agreement, goods are identified to the contract at the time it is made, if the contract is for the sale of goods already made and identified. 11A V.I.C. § 2-501(1)(a).[6]

■ Since Morcher and Nash agreed that some interest in title to goods identified to the contract would pass for a price, the bill of sale is a valid contract. The bill of sale specified that Kurt Morcher was transferring an interest in title, specifically co-ownership of the Bismarck, to Merry Nash. The specific goods were identified to the contract by the inclusion of the make, length, name and hull number of the boat in the contract. The contract recites a price of $10 and other "good and valuable consideration" in exchange for an interest in the craft, which is supported by the undisputed testimony that Nash gave Morcher two five dollar bills. That other consideration was rendered after the execution of the contract is evident from the fact that the defendant, a licensed small-craft captain, was responsible for navigating the Bismarck during its maiden voyage from Florida to Chocolate Hole. Other consideration could also have taken the form of the defendant's caring for Mr. Morcher during his suffering from cancer. The Court concludes there was sufficient consideration to bind this agreement and that the agreement met the required formalities to constitute a valid contract.

---

[6] Kurt Morcher was clearly a seller and the defendant was undoubtably a buyer. See V.I. CODE ANN. tit. 11A, § 2-103.

## 2. *What Interest in Bismarck Was Conveyed in the Bill of Sale*

It seems the law of real property has always required strict compliance with rigid formalities, going back to the early days of the common law and the importance of land as evidence of wealth to be transferred by deed or by devise. Linguistic specificity has been carried forward in current Virgin Islands' law for the conveyance of real property. Such formalities have not been required for the transfer of personal property, however, as reflected in the relative looseness of the UCC definitions for the sale of personalty, including those quoted above.

There is no question that the Virgin Islands recognizes joint tenancy as a form of holding title to property. Both parties recognize joint tenancy in real property. Moreover, the requisites for creating a joint tenancy with right of survivorship are stated in 28 V.I.C. § 7(b), which includes a reputable statutory presumption against a joint tenancy being created by a conveyance of land to two persons who are not husband and wife. It also provides that the presumption may be rebutted by express language which contains the magic words, "the grantees . . . shall take the land as joint tenants." Plaintiff proposes that, if the Court is going to accept joint tenancy as a form of taking and holding title to personal property, it must incorporate the same presumption against joint tenancy with right of survivorship and the same linguistic formality and express, magic words of creation.

■ The Court hereby holds that a transfer of personal property to two (or more) persons can create a joint tenancy with right of survivorship. The Court even agrees that the public policy against joint tenancy embodied in the reputable presumption favoring tenancies-in-common in real property should apply to transactions in personal property. Since the requisites for sales and contracts of sale for personalty are much looser than conveyances of land, however, there are no magic words necessary for rebutting the presumption and creating a joint tenancy in a boat, such as the Bismarck. All the circumstances of the transfer document, bill of sale in our case, are examined to determine whether the presumption was rebutted and the transferor established a joint tenancy.

The words used by Kurt Morcher in the bill of sale to Merry Nash evidence a strong intention to convey a joint tenancy.

419

Keeping in mind the document was drafted by a layman, the use of the word "co-ownership" shows an intent to transfer an ownership interest in the Bismarck to Nash which was the equivalent of his own. The phrase "Kurt Morcher or Merry Nash" implements his desire that she be the only one to have an interest in the boat once he died. Morcher's actions after the bill of sale confirm this construction. Once the boat was on St. John, Morcher referred to the Bismarck as belonging to the defendant. Whenever he invited guests aboard and they offered him their thanks, he always directed them to thank Nash as, "she is the captain," or "the boat is Merry's." He told one friend on several occasions that the boat would belong to Nash after he died. This is strong evidence Kurt Morcher intended to sell Nash an interest in the Bismarck such that she would own the whole thing upon his death, a classic example of what is categorized in law as joint tenancy with right of survivorship.

Kurt Morcher undoubtably knew his long-term prognosis was not good. He had separated from his wife some four years before and, after providing amply for his wife and children, had created a separate household and life with the defendant. He conveyed the boat to his companion, the woman with whom he had chosen to spend his final days and to someone with whom he entrusted his earthly remains. The Court cannot conceive that Kurt Morcher could possibly have intended his estranged wife and his mistress to each own half of Bismarck after his death, which is a characteristic of the tenancy-in-common suggested by the plaintiff.

The other characteristics of a joint tenancy in property namely, "the four unities," are also satisfied by the bill of sale. To qualify as a joint tenancy there must be: 1) unity of interest (each owner must enjoy the same right in the property); 2) unity of title (each owner must take her interest in the property from the same instrument); 3) unity of time (each owner must acquire his interest at the same moment); and, 4) unity of possession (each owner must have the same right to possess and enjoy the entire property). Both Kurt Morcher and Merry Nash enjoyed the same interests in the Bismarck. Morcher conveyed to Nash an ownership interest sufficient to make each the equivalent to the other. Both had unity of

title and of time, acquiring their interests in the Bismarck in the same bill of sale at the same instant.[7]

■ The Court concludes that the bill of sale created a joint tenancy of Kurt Morcher and Merry Nash, with right of survivorship, in the oil screw Bismarck. Accordingly, Kurt Morcher's interest in the Bismarck passed automatically by operation of law directly to Merry Nash. Kurt Morcher's estate received no interest in the Bismarck which could have passed to plaintiff.

## D. Damages and Attorney's Fees

At the conclusion of trial, the Court indicated it would consider an award of attorney's fees to Nash as prevailing party.[8] In this regard, the Court has had the benefit of both counsels' excellent memoranda on the subject.

Mrs. Morcher maintains that an award of attorney's fees is not permitted, relying on *Sosebee v. Rath*, 893 F.2d 54 (3d Cir. 1990). Under Sosebee, federal courts sitting in admiralty and applying substantive maritime law should follow the strong federal interest in uniformity by not awarding attorney's fees to the prevailing party absent a finding of bad faith. *Id.* at 56. In *Sosebee*, the plaintiff successfully argued for the application of substantive federal maritime law to his case for compensation for injuries sustained while scuba diving, and the trial court instructed the jury under substantive maritime law. *Id.* at 55. There was no occasion for the application of local law in any form, including the Virgin Islands fee-shifting statute 5 V.I.C. § 541.

Mrs. Morcher, however, has conceded there is no rule of federal maritime law applicable to the facts. Although the Court's juris-

---

[7] The ancient common law denied unity of time where one attempted to creat a joint tenancy by a conveyance to oneself and another. The overwhelming majority of states have abandoned this formalism however, and recognize that, since grantor could accomplish the same end by conveying to a strawman who would convey back to grantor and another, there is no reason to prohibit the grantor from directly conveying a joint tenancy to himself and another. See e.g., *Miller v. Riegler*, 243 Ark. 251, 419 S.W.2d 599 (Ark. 1967); *Therrien v. Therrien*, 94 N.H. 66, 46 A.2d 538 (N.H. 1946). Finally, both Kurt Morcher and Merry Nash concurrently enjoyed the same right to full possession of the Bismarck.

[8] The Virgin Islands does not follow the "American Rule." Thus, an award of costs and attorney's fees may be made to the prevailing party in a civil action. 5 V.I.C. § 541.

diction over this case sounds in admiralty, the merits have been decided under local, Virgin Islands law. There is, therefore, no federal interest, strong or otherwise, grounded in maritime law to be considered. In short, *Sosebee* is inapposite.

■ Defendant Nash clearly is the prevailing party for purposes of 5 V.I.C. § 541. The Court has considered the respective claims to ownership of the Bismark and has awarded full, sole, and complete title to Merry Nash. As the prevailing party, the Court finds that Nash is entitled to be compensated for her costs and attorney's fees. The defendant shall submit whatever documentation and affidavits are required to prove those fees and costs and to support a further finding by the Court of the amount which should in justice and reason be awarded.

It does appear, however, that the Court erred by awarding defendant some $300 as damages to the Bismarck while it was in the hands of the substitute custodian. The custodian did not act as agent for the plaintiff and plaintiff is therefore not liable to the defendant on a theory of *respondeat superior.* Accordingly, the Court will vacate that portion of its ruling from the bench which awarded damages of $300 to the defendant for injury to the Bismarck while it was in the hands of the substitute custodian.

### III. CONCLUSION

For the reasons set forth above, the Court declares that Merry Nash, the surviving joint tenant in the vessel with right of survivorship, succeeded by operation of law to all right, title and interest in the vessel Bismarck upon Kurt Morcher's death. Further, plaintiff shall pay the defendant's attorney's fees and costs in such amount as proper affidavits and further consideration by the Court shall establish. Finally, the Court's award of $300 damages to the defendant is vacated. An appropriate order shall issue.

ENTERED this 21st day of September, 1998.